Benjamin L. HOOPENGARNER, Appellant,

v.

UNITED STATES of America, Appellee.

No. 13391.

United States Court of Appeals Sixth Circuit.

July 7, 1959.

Walter Shapero, Detroit, Mich., Sidney L. Cohn, Detroit, Mich., on brief, for appellant.

George E. Woods, Detroit, Mich., Fred W. Kaess, Detroit, Mich., on brief, for appellee.

Before McALLISTER, MILLER, and BAZELON, Circuit Judges.

McALLISTER, Circuit Judge.

This is an appeal from the judgment of the District Court, convicting appellant of operating a motorboat recklessly on the waters of Lake St. Clair, as well as for his misconduct, negligence, and inattention in operating his boat without lights, thereby causing the death of Virginia Ward and endangering the lives of several other persons, in violation of Title 18 U.S.C.A. § 1115, and Title 46 U.S. C.A. § 526, subdivisions (L) and (M). The case was tried by the court without a jury, and the sentence of the court was that appellant be committed to the custody of the Attorney General or his authorized representative for imprisonment for a period of one year on each of two counts, the sentences on each count to run concurrently.

Appellant pleaded double jeopardy on the ground that he had already been prosecuted for the same offense in the state court. He further contended that the Constitution, as well as the Federal Rules of Criminal Procedure, required dismissal of the indictment; that the District Court had no jurisdiction over the offense; that his conduct was not the proximate cause of the death of Virginia Ward; and that the court abused its discretion by failing to suspend the sentence.

The background of the case is as follows: On the late afternoon of August 8, 1952, a cabin cruiser owned and operated by Mr. Russell Rousch left the Clinton River and proceeded into the waters of Lake St. Clair. Mr. Rousch was accompanied by his wife and by Mr. Robert Ward and his wife, Virginia, and their two children, Donna and Aleen Ward, and Virginia Ward's parents, Mr. and Mrs. Alphonse van Riette. They were on a fishing expedition, and after going out about three miles into Lake St. Clair, they anchored off Strawberry Island and continued to fish there until twilight. They then commenced their return in a fairly direct course toward the mouth of the Clinton River, approaching the channel of the river which is defined by two rows of buoys, the red buoys on the north side of the channel, and the black, on the south side. The channel is about 100 feet wide. It was a moderately warm evening, with a very slight breeze blowing from the east northeast. Near the first buoy of the channel was a slight current of approximately one-sixth of a mile per hour, flowing in a southerly direction. The sun set at 7:46 P. M. on that particular day, and the moon arose at 8:22 P. M. It was the night following full moon. As Mr. Rousch's cruiser approached the Clinton River along the north side of the channel and near the first buoy, about 850 feet from the nearest point of land, a collision occurred between the cruiser and a speedboat owned by Mr. Benjamin L. Hoopengarner.

The collision occurred around 9:00 P. M. The sun had gone down about an hour before, and the moon was just rising. It was dark. With the impact of the collision, all of the occupants of Mr. Rousch's cruiser climbed overboard, just before the boat sank. Mr. Hoopengarner was thrown into the water and his speedboat, in its damaged condition and with motor running, continued on a wild course to a point where it was later located and salvaged.

After the collision, there was much shouting from the people who were in the water. About that time, a number of small cruisers were returning to the Clinton River from Canada with members of an organization and their friends who had been attending an outing there.

They arrived within a few minutes of the collision and, together with Mr. Hall, who had rowed his boat out from the dock at the river, when he heard the collision, rescued Mr. Hoopengarner and all of the members of the Rousch party except Virginia Ward. Her body was found floating in the water. Mr. Gerlock, from one of the cruisers, took the body aboard and immediately went to the first dock on the river where efforts were made toward artificial respiration; but Virginia Ward was then deceased, having been killed in some way as a result of the collision. When she was in the water immediately after the collision, she had her small child in her arms, and asked her husband to take the child and to look after her mother, Mrs. van Riette. At that time, she stated that she was all right. A few minutes later, her body was found floating. Her death was not the result of drowning. Her breast bone, or sternum, had been fractured by reason of a severe blow inflicted afterward, and not by reason of the force of the collision of the two boats. The cause of her death was hemorrhage due to her lungs being punctured by her fractured breast bone. The blow causing death was inflicted by an object (possibly a moving rescue boat) sometime after, and not at the time of, the collision, while the deceased was in the water and after she had left the sinking boat. Death was practically instantaneous with the infliction of the blow.

The District Court, sitting as a jury, found that the collision had occurred on the north side of the channel where the Rousch cruiser had a right to be and where it was properly proceeding in the direction of the mouth of the Clinton River, and that, at the time of the impact, the Rousch cruiser was proceeding in a lawful, careful, and proper manner, and had its lights lighted. The court further found from the evidence that Mr. Hoopengarner had been drinking beer and whiskey prior to the collision; and, from the testimony of witnesses who saw him afterward, that he was intoxicated that evening at the time the collision occurred. It further found that he was operating his speedboat in the dark, without lights, on the wrong side of the channel, at an excessive and dangerous rate of speed; and that, by reason of his intoxicated condition, his operation of the speedboat in the dark, without lights, and at such excessive and dangerous rate of speed, he was guilty of negligence, misconduct, and inattention to his duties in the operation of his speedboat in manner and form as set forth in the indictment. Finally, the court found, from the evidence which convinced it beyond a reasonable doubt, that the aforementioned conduct of Mr. Hoopengarner was the proximate cause of the collision; that it caused the death of Virginia Ward; and that it endangered the lives of the other occupants of the Rousch cruiser. Accordingly, the court thereupon passed sentence on appellant, as above mentioned.

On review, we discuss the issues raised by appellant.

■ It appears that, prior to his trial in the District Court, he was tried, on the same evidence, in the state court upon an information which had been filed against him charging manslaughter; that he was convicted by a jury of simple assault; and that he was sentenced to pay a fine of $100 and costs of $50, which he paid. Appellant claims that his indictment, trial, and sentence in the District Court constituted "double jeopardy," in violation of the provisions of the Fifth Amendment. Upon the argument of the case before this court, counsel for appellant submitted that the Supreme Court had granted a writ of certiorari in Abbate v. United States, 5 Cir., 247 F.2d 410, and that the issue of double jeopardy in the instant case would be controlled by the Supreme Court decision in Abbate. We, accordingly, deferred consideration of this question pending that determination. Since then, the Supreme Court has resolved the issue against the contention made in this regard in Abbate v. United States, 359 U. S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729. On this question, therefore, we conclude that

appellant herein was not subjected to double jeopardy, in violation of his rights under the Fifth Amendment.

Appellant next contends that Rule 48 (b) of the Federal Rules of Criminal Procedure, 18 U.S.C.A., and the "speedy trial" guarantee of the Sixth Amendment required dismissal of the indictment.

Rule 48(b) provides:

"Dismissal * * * (b) By Court. If there is unnecessary delay in presenting a charge to a grand jury or in filing an information against a defendant who has been held to answer to the district court, or if there is unnecessary delay in bringing a defendant to trial, the court may dismiss the indictment, information, or complaint."

■ The Sixth Amendment provides:

"In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial."

The Sixth Amendment applies to the right to a speedy trial after formal complaint is lodged against a defendant in a criminal case. It has been held that the constitutional right to a speedy trial does not arise until after such formal complaint has been filed. See D'Aquino v. United States, 9 Cir., 192 F.2d 338, 350. There is no contention made that there was any undue delay in the prosecution of the action after the complaint or information; and, accordingly, this case presents no valid issue of violation of constitutional rights under the Sixth Amendment.

■ As to Rule 48(b) of the Federal Rules of Criminal Procedure, the District Court is authorized to dismiss the indictment, information, or complaint, providing there has been an unnecessary delay in presenting a charge to a grand jury or in filing an information against a defendant who has been held to answer to the District Court, or if there is unnecessary delay in bringing a defendant to trial. There was no unnecessary delay in the prosecution of defendant after he had been held to answer. As to delay from the time of the commission of the offense to the commencement of the criminal proceedings, that is controlled by the Statute of Limitations, which is not here in question.

■■ It is claimed by appellant that his conduct was not the proximate cause of the death of Virginia Ward. The District Court drew the reasonable inference from the evidence that Virginia Ward had been struck by one of the rescue boats in the dark, and that her death resulted therefrom. It would seem clear that one of the natural and probable consequences of the manner of operation of the boat by appellant that night was that he would strike another boat in the channel; and that a natural and probable consequence of a collision was that such persons as were cast into the water would be subject to the perils of rescue operations conducted in the dark on dangerous waters. It is a foreseeable consequence of such conduct that a person so cast into such dark waters, in a busy lane where other boats are operated, would or might be struck or sustain a blow in the process of being rescued. Where it reasonably might or should have been foreseen by appellant that the commission of his act would be likely to create a situation which would expose another to the danger of injury or death, at the hand of a non-participant in such reckless conduct, the creation of such dangerous situation is to be regarded as the proximate cause of the death of the innocent person. Appellant's actions constituted the proximate cause of the death of Virginia Ward.

We come, then, to the issue whether the District Court had jurisdiction over the offense charged. In this regard, appellant submits that the situs of the offense was within the jurisdiction of the State of Michigan, and, therefore, outside the federal admiralty and maritime jurisdiction; and that, accordingly, the District Court was in error in refusing to grant appellant's motion to dismiss the indictment.

Article I, Section 8, Clause 10, of the Constitution delegates to Congress the

power "to define and punish Piracies and Felonies committed on the high Seas and Offences against the Laws of Nations."

Article III, Section 2, of the Constitution extends the judicial power of the United States "to all Cases of admiralty and maritime Jurisdiction."

██ The Great Lakes come within the definition of "the high Seas," as used in the Constitution. The Detroit River, from shore to shore, is within the admiralty jurisdiction of the United States, as a connecting stream between the open and unenclosed Waters of the Great Lakes. United States v. Rodgers, 150 U.S. 249, 14 S.Ct. 109, 37 L.Ed. 1071. As a connecting stream, it is within the admiralty and maritime jurisdiction of the federal court. Foppen v. Peter J. Fase & Co., 219 Mich. 136, 188 N.W. 541; and the jurisdiction of the federal admiralty and maritime law extends to the actual situs of an injury taking place on a dredged slip, some 600 feet back from the Detroit River. La Casse v. Great Lakes Engineering Works, 242 Mich. 454, 219 N.W. 730.

██ Title 18 U.S.C.A. § 7, refers to the special maritime and territorial jurisdiction here in question, as follows:

"The term 'special maritime and territorial jurisdiction of the United States', as used in this title, includes: (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State. (2) Any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them, or upon the Saint Lawrence River where the same constitutes the International Boundary Line."

Appellant submits that the inclusion of the "high seas," as used in the above statute, is to be understood as being subject to the limitation of the words, "out of the jurisdiction of any particular State." The District Court read the statute as providing that the special maritime and territorial jurisdiction of the United States includes the "high seas," and "any other waters within the admiralty and maritime jurisdiction of any particular state."

The District Court, therefore, construed the statute to the effect that, under the inclusion of provision (1) of the above statute, the situs need not be out of the jurisdiction of any particular state if the offense is committed on the "high seas"; and that under the inclusion of provision (2), the situs need not be out of the jurisdiction of any particular state, if the offense is committed on, or by, "any vessel registered, licensed, or enrolled under the laws of the United States, and being on a voyage upon the waters of any of the Great Lakes, or any of the waters connecting them." Since the waters of Lake St. Clair are a connecting waterway between some of the Great Lakes, the District Court held that they fell within the test of United States v. Rodgers, supra, as being within federal jurisdiction in being part of the "high seas." With this construction, we concur.

Moreover, appellant's boat was a vessel registered, licensed, and enrolled under the laws of the United States, and was, at the time of the disaster, on a voyage upon the waters of Lake St. Clair, a connecting waterway of the Great Lakes. Appellant's vessel also had, and bore, a number officially registered with the United States Coast Guard, to which appellant reported the collision five days thereafter, in accordance with the federal government's instructions that a marine casualty or accident be reported "without delay." Under the above statute, the maritime and territorial juris-

diction included the offense committed on the connecting waters of the Great Lakes by appellant's vessel.

■ The contention is advanced that, assuming that federal maritime jurisdiction does extend to areas within the jurisdiction of particular states, nevertheless, it does not extend to waters that, in the legal sense, cannot be considered navigable. The District Court held that the waters upon which the collision occurred were navigable waters, as being a part of Lake St. Clair which was a connecting waterway of the Great Lakes, through which a channel extended accommodating more tonnage than goes through the Panama and Suez Canals combined, although such channel is not connected with the shallow channel on which the collision in this case occurred. We agree in this regard with the holding of the District Court.

■ It is further argued that the federal court had no jurisdiction, because it did not have exclusive jurisdiction. We do not read the law as requiring such a condition. The fact that an offense can be prosecuted at common law in a state court does not oust the maritime jurisdiction of a federal court. United States v. Holtzauer, C.C.D.N.J., 40 F. 76. A federal court, under the maritime jurisdiction of the United States, may have jurisdiction over an offense, even though the state courts have concurrent jurisdiction. The Propeller Genesee Chief v. Fitzhugh, 12 How. 443, 458, 53 U.S. 443, 458, 13 L.Ed. 1058. Were there any doubt as to this principle, federal jurisdiction over offenses committed on the "high seas," which include the Great Lakes and their connecting waters, would prevail; but, in our view, there is no such doubt.

Appellant cites People v. Duvall, 243 Mich. 498, 220 N.W. 785, a case involving search and seizure of liquor being transported in violation of the state law of Michigan. The sheriff of Monroe County, from a rowboat in La Plaisance Bay, a bay of Lake Erie, saw defendant and his companions loading beer from a motorboat into a rowboat, in the dark, at a distance of about 200 feet from shore, where the water was three or four feet deep. The defendant then lowered himself into the shallow water, and started dragging the rowboat toward the shore. When he was about 25 feet from the shore, he was arrested. If the water was only three feet deep 200 feet from shore, it was presumably, much shallower 25 feet from the shore where defendant was arrested, and the contents of the rowboat seized. In its opinion, the Supreme Court of Michigan observed that at the time the sheriff saw defendant unloading the liquor, the sheriff was in a rowboat in the shallow water near the shore. The Court said: "The officers were on the navigable waters of the state and saw defendant and his companions transferring beer from the motorboat to the rowboat." If such shallow waters were considered by the court to be navigable waters, there should be no doubt as to the fact that the waters of the channel in Lake St. Clair, where the collision in the instant case occurred, were navigable waters. The Supreme Court of Michigan continued, in its opinion, to consider an attack on the jurisdiction of the state court: "The objection that the court did not have jurisdiction because the *locus in quo* was in Lake Erie is without merit. The testimony shows that the *locus in quo* was in the shallow waters of La Plaisance bay in Monroe township, Monroe county, Michigan, near Bolles Harbor. The bay is a part of Lake Erie within the limits of the state, and the circuit court for Monroe county had jurisdiction." If the waters in La Plaisance Bay, where the officers saw the violation, were navigable waters, the federal courts would, also, undoubtedly, have jurisdiction of an offense committed on a cruiser at such a place, for it would be on navigable waters of a part of Lake Erie, being, therefore, on the "high seas." The cited case discloses little more than that the state court had jurisdiction over an offense under state law, committed in shallow water 25 feet from the shore of a bay of Lake

472

Erie, within the boundaries of Monroe County.

■ Finally, it is claimed that the District Court "grossly abused its discretion as a matter of law" as well as according to "concepts of human justice by failing to suspend sentence."

In the state court, appellant had been tried for manslaughter and convicted of simple assault, for which he was sentenced to pay a fine of $100 and costs. In the District Court, he was thereafter tried for the same conduct for violation of two federal statutes and convicted of offenses for which he was subject to a total imprisonment of eleven years, and a fine of $12,000. He was sentenced to the custody of the Attorney General for imprisonment for one year, with no fine.

It is said on his behalf that appellant was arrested, in the state court proceedings, incarcerated, publicly scorned, tried before a jury, convicted, paid the penalty there prescribed, and for, the rest of his life, will be haunted by the memories of that fatal night; that all that went before the commencement of the present proceedings rehabilitated appellant, and served as a deterrent, far more effectively than incarceration, under the sentence of the District Court in the instant case, can ever do; and that, therefore, in sentencing him to imprisonment for one year, the District Court abused its discretion.

In all the affairs of men, the follies or faults of a moment or a day may sadden all the years of a lifetime, and all are needful of will or resolution, or of the Divinity they worship, to be preserved to the last of their days from a fate that, hid in an auger-hole, may rush and seize them.

Appellant was not placed in double jeopardy. The sentence could be said to have been a minimum one under the aggravated circumstances, and could not be considered excessive, harsh, and cruel; nor does the fact that appellant had been tried in the state court, and convicted of simple assault, together with the humiliation and remorse attendant on the trag-

edy, infuse the present sentence with excessiveness or cruelty. Rather, the sentence appears to have been tempered by a humane consideration of all of these factors, on the part of the District Court. In the sentence, there was no abuse of discretion.

In accordance with the foregoing, the judgment of the District Court is affirmed.