**UNITED STATES of America**

v.

**Cesar A. ORTEGA and Richard L. Ventola.**

**Appeal of Richard L. VENTOLA.**

No. 74–2249.

United States Court of Appeals, Third Circuit.

Argued April 17, 1975.

Decided June 12, 1975.

---

Roger A. Lowenstein, Federal Public Defender, Newark, N. J., for appellant.

Jonathan L. Goldstein, U. S. Atty., John J. Barry, Richard S. Zackin, Asst. U. S. Attys., Newark, N. J., for appellee.

Before SEITZ, Chief Judge, and RO-SENN and WEIS, Circuit Judges.

## OPINION OF THE COURT

WEIS, Circuit Judge.

In the jurisprudence of childhood, "finders keepers, losers weepers" is accepted as dogma. The federal kidnapping act, however, takes a somewhat different approach and makes the possession of money with knowledge that it was delivered as ransom a criminal offense. In this appeal we sustain defendant's conviction under that Act despite his contention that, since he intercepted the money before it reached the kidnappers, the ransom had not been "delivered" as the statute requires.

After seizing eight-year old John Calzadilla on March 6, 1974, the boy's kidnappers demanded $50,000 in ransom money from his father. Mr. Calzadilla borrowed the money and drove his car from New York to New Jersey where he threw a bag containing the cash from a small bridge. He thought that this was the location designated by the kidnappers in a series of telephone calls, but it turned out to be the wrong bridge. When the father returned home, he was surprised to receive another call from the kidnappers complaining that they could not find the ransom. Calzadilla went back to the bridge, but his attempts to retrieve the package were unsuccessful. The boy was released unharmed on March 8, 1974, but when the kidnappers were captured a short time thereafter, they did not have the ransom.

Ultimately, it was learned that defendant Ventola and a co-employee named Ortega were working in a railroad yard under the bridge and that they had found the bag which Calzadilla had tossed. The two men divided the money and maintained secrecy about their find.

In an effort to locate the ransom money, the F.B.I. questioned defendant Ventola and the other defendant, Ortega, in addition to six other railroad employees who had been near the bridge on the night the money disappeared. The agents disclosed to all of the men that they were seeking the ransom, and thus the identity of the owner and the events preceding the find became known to Ventola. Later, each workman appeared before a grand jury which was also investigating the incident. Ventola had earlier denied any knowledge of the whereabouts of the money in response to the F.B.I. inquiry, and he continued to do so when he appeared before the grand jury on March 19, 1974.

On April 9, 1974, a friend of Ventola told the F.B.I. that the defendant, some days previously, had said that he had the money. When confronted with this statement, Ventola admitted his complicity and named Ortega as a participant in the affair.

In due course, defendant was convicted of possession of ransom money (18 U.S.C. § 1202) and of making false statements before a grand jury (18 U.S.C. § 1623). He was sentenced to two concurrent terms of six months.[1]

Ventola contends that his testimony before the grand jury should have been suppressed because he was not given the complete *Miranda* warnings. He asserts that, since he and the other seven workmen were the targets of the grand jury investigation, due process required that he be given the appropriate notification of his rights.

Before the testimony commenced, the assistant United States Attorney had advised Ventola that:

1. he had the right to remain silent;
2. he did not have to say anything to the grand jury;
3. he had the right to an attorney who could be consulted outside the grand jury room;
4. he had the right to stop answering questions at any time during the proceedings; and
5. anything he said could be used against him.

The defendant contends that he should also have been told that an attorney would be furnished if he could not afford to retain one.

The district court held an evidentiary hearing before trial and found that the inquiry had not yet focused on Ventola when he testified before the grand jury. Accordingly, the defendant's motion to suppress his testimony was denied.

█ There is no constitutional requirement that a witness before a grand jury, at least one who is not a putative defendant, be advised of his constitutional rights. *DiMichele v. United States*, 375 F.2d 959 (3d Cir.), *cert. denied*, 389 U.S. 838, 88 S.Ct. 54, 19 L.Ed.2d 100 (1967). While that doctrine has been criticized,[2] it remains the law in this circuit. *See United States v. Lardieri*, 506 F.2d 319 (3d Cir. 1974).

█ Based, as it was, upon conflicting oral testimony, the trial court's factual finding that Ventola was not a putative defendant is not clearly erroneous and, hence, is binding upon us. *See United States v. Delerme*, 457 F.2d 156, 160 (3d Cir. 1972). Accordingly, we do not reach the question of whether prosecutorial unfairness would require suppression of perjurious testimony when a target defendant is not given adequate warning before his grand jury appearance. *Compare United States v. Mandujano*, 496 F.2d 1050 (5th Cir. 1974), *cert. granted*, 420 U.S. 989, 95 S.Ct. 1422, 43 L.Ed.2d 669 (U.S. Mar. 24, 1975), *with United States v. Winter*, 348 F.2d 204 (2d Cir.), *cert. denied*, 382 U.S. 955, 86

---

1. All but $3,100 of the money was recovered. Ventola returned his entire share of $25,000; Ortega had spent $3,100 before being apprehended.

2. *See* The Rights of a Witness Before a Grand Jury, 1967 Duke L.J. 97.

S.Ct. 429, 15 L.Ed.2d 360 (1965). *See also United States v. Lardieri*, 506 F.2d at 324. We conclude that on the state of this record the trial court did not err in refusing to suppress the defendant's testimony before the grand jury.

■ The defendant also attacks his conviction for possession of ransom money on the basis that the statute is inapplicable. He argues that, while he may have been guilty of common law larceny, the federal offense consists of possession of money "which has at any time been delivered as ransom" and no "delivery" has been shown here.[3] Defendant's contention is simply that "delivery" requires transfer of possession of the ransom from the payer to the kidnappers—*i. e.*, it is the two-step process of giving up possession by one and receiving it by the other.

■ We are mindful of the general admonition that criminal statutes are to be strictly construed and that ambiguities are to be resolved in the defendant's favor. *United States v. Maze*, 414 U.S. 395, 94 S.Ct. 645, 38 L.Ed.2d 603 (1974); *United States v. Bass*, 404 U.S. 336, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971). Nevertheless, we are required to give words their fair meaning in order to achieve the evident statutory purpose. *United States v. Cook*, 384 U.S. 257, 86 S.Ct. 1412, 16 L.Ed.2d 516 (1966).

Section 1202 is an extension of § 1201, to which it specifically refers. Its scope is limited and applies only to kidnappings. It is logical, therefore, to consider the meaning of the word "delivered" as it would apply in that context, not in ordinary commercial activity. Seldom is ransom transferred at a person-to-person encounter. The more common procedure is to have the money placed at some location chosen by the kidnapper to avoid identification and detection. When the transferor has done all that is required of him by placing the cash at the place specified, in common parlance and understanding he is said to have "delivered" it. Here, Mr. Calzadilla did part with possession of the money by throwing it from a bridge pursuant to the kidnappers' orders. Whether the directions he followed were inadequate or whether he was mistaken as to the instructions is of no great moment; as far as he was concerned, the ransom had been "delivered." From that point on, the money became tainted, and a proscription on its use or possession applied to all who knew it was ransom.

The statute was intended to extend federal jurisdiction to persons having only an indirect connection with the actual kidnapping and to discourage any cooperation with those primarily responsible. The construction urged by the defendant would impose difficult problems of proof upon the prosecution, burdens which we doubt that Congress intended to attach. Thus, an individual possessing money which he knows had been paid as ransom could escape punishment if the prosecution were unable to prove prior possession by the kidnappers. We do not think that Congress intended such a result.

Our interpretation of the statute uses the common meaning of the word "delivery" and effectuates the legislative intent. We conclude that there was "delivery" here and that the defendant came within the scope of the proscription.

Ventola also contends that there is a jurisdictional defect in his conviction on the ransom count because he had no connection with the interstate commerce element of the primary kidnapping offense. Congress based its power to make kidnapping a federal offense on the legal theory that transportation of the victim has an effect on interstate commerce.

---

**3.** 18 U.S.C. § 1202 reads:

"Whoever receives, possesses, or disposes of any money or other property, or any portion thereof, which has at any time been delivered as ransom or reward in connection with a violation of § 1201 of this title, knowing the same to be money or property which has been at any time delivered as such ransom or reward, shall be fined not more than $10,000 or imprisoned not more than 10 years, or both."

The offense described in § 1202 is an amendment to the federal kidnapping act and was enacted at the suggestion of the Attorney General, who noted that the then existing law was inadequate to reach persons handling ransom money.[4] Ransom is the usual motive for kidnapping, and penalties for knowingly possessing the fruits of the crime are logical and necessary to discourage commission of the underlying offense. The connection here is not tenuous but, rather, is the prohibition of an integral part of the criminal scheme which is concededly within federal jurisdiction. Once the defendant learned that his find was ransom money but decided to keep possession nevertheless, he brought himself within the ambit of the underlying offense. Section 1202 is not a separate, detached violation. It is directed to only a portion of a larger offense which includes a number of components. Once jurisdiction is established for the whole offense, there can be no successful attack on that which is but a part.[5]

Ventola also asserts that he lacked the necessary criminal intent because he feared physical harm from his co-employee, Ortega. At trial, Ventola said that Ortega had boasted about using a gun. The defendant wished to add to his case by presenting the testimony of two witnesses to an incident when Ortega had brandished a gun in a barroom. The trial judge refused to permit this testimony. That ruling was not erroneous because Ventola had no personal knowledge of the incident and, therefore, his opinion of Ortega could not have been influenced by it. He had already described his reactions to Ortega, and the witnesses' testimony would have been irrelevant. Moreover, it is doubtful that the defendant, even by his own testimony, had established a defense of legal duress, and the ruling is sustainable on that basis as well. *United States v.*

*Birch,* 470 F.2d 808 (4th Cir. 1972), *cert. denied,* 411 U.S. 931, 93 S.Ct. 1897, 36 L.Ed.2d 390 (1973).

Lastly, it is urged that the trial court was in error in refusing to charge that Ventola could be acquitted if he had relied upon the advice of F.B.I. agents in attempting to return the money anonymously. We find no error in the trial court's ruling because the "advice" occurred a week after the defendant had made his false statements to the grand jury and, furthermore, no attempt was ever made to return the money in the manner suggested.

The judgment of the district court will be affirmed.

---

4. *See* S.Rep.No.779, 74th Cong., 1st Sess. (1935).

5. We note that there had been an interstate transportation of the money from New York to New Jersey. However, we do not consider that fact in addressing the issue of jurisdiction.