UNITED STATES of America

v.

Cyril E. LaBRECQUE, Defendant.

Crim. No. 75–226.

United States District Court,
D. New Jersey.

July 27, 1976.

## OPINION ON MOTION FOR JUDGMENT OF ACQUITTAL

BROTMAN, District Judge.

On January 25, 1974 the *Sadie and Edgar,* an auxiliary-powered Newfoundland sailing schooner approximately 62 feet in length, set sail from Connecticut on a voyage to Florida. On board were Cyril E. LaBrecque, the Captain of the *Sadie and Edgar,* Jessie LaBrecque, the Captain's wife, Valentine Bach, First Mate, and three young men who comprised the ship's crew, Michael Riker, Paul Sagarino and Bradford Blakely. Also on board was Captain LaBrecque's dog, Hap, a Labrador retriever weighing approximately 70 pounds. For the LaBrecque, avid boaters, the voyage was to be the culmination of a dream, that dream being the beginning of a new life of semi-retirement in Florida aboard the *Sadie and Edgar.* For the three young men, close friends only recently graduated together from high school in Connecticut, the voyage was to be an adventure; certainly it was also an interlude, indeed a passage, between boyhood and manhood. This voyage, born of the idealism of youth and of middle age, ended on the morning of January 29, 1974 in stark and utter tragedy with the deaths of Paul Sagarino and Bradford Blakely in the cold waters of the Atlantic Ocean off the coast of New Jersey near Brigantine. Cyril LaBrecque is here charged with criminal responsibility for the deaths of the two young men.

The Indictment reads in three counts. Count I charges the defendant with causing the lives of Paul Sagarino and Bradford Blakely to be destroyed through misconduct, negligence, neglect and inattention to his duties in violation of 18 U.S.C. § 1115. Count II charges that as a result of a lack of due caution and circumspection the defendant caused the deaths of the two young men in violation of 18 U.S.C. § 1112. Count III charges the defendant with endangering the life, limb and property of persons on board the *Sadie and Edgar* in violation of 46 U.S.C. § 1461(d).

Central to each of the three counts are six acts or omissions of the defendant which

Jonathan L. Goldstein, U. S. Atty., by Bruce I. Goldstein, Executive Asst. U. S. Atty., Carl R. Woodward, Kenneth N. Laptook, Asst. U. S. Attys., Newark, N. J., for plaintiff.

Roger A. Lowenstein, Federal Public Defender, John F. McMahon, First Asst. Federal Public Defender, Newark, N. J., for defendant.

the Government alleges, singularly or concurrently, proximately caused the deaths of Paul Sagarino and Bradford Blakely. First, defendant attempted to sail along the New Jersey coast in winter in an unseaworthy vessel. Second, he attempted to sail with a crew which he knew or should have known to be inexperienced and inadequately trained. Third, he attempted to sail without an operating ship-to-shore radio or other operating electronic equipment on board the *Sadie and Edgar*. Fourth, he sailed and navigated the *Sadie and Edgar* negligently, neglectfully and inattentively, thus causing the vessel to run aground and sink. Fifth, he failed and refused, after the *Sadie and Edgar* sank and its two lifeboats had been launched, and one of the lifeboats had capsized, to require those persons, including himself, who were in the remaining lifeboat periodically to change places with the three crew members in the water, the temperature of which was approximately 43 degrees Fahrenheit. Sixth, he failed and refused to remove or direct the removal of the large dog from the one remaining lifeboat so as to enable one of the persons in the water to take the dog's place.

█ The Government has completed the presentation of its case and the defendant has made a motion for judgment of acquittal.[1] Fed.R.Crim.P. 29(a) provides in pertinent part:

> The court on motion of a defendant or of its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment or information after the evidence on either side is closed *if the evidence is insufficient to sustain a conviction of such offense or offenses.* [emphasis added].

In determining the sufficiency of the evidence the trial judge "must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact, a reasonable mind might fairly conclude guilty beyond a rea-

sonable doubt." *United States v. Gross,* 375 F.Supp. 971, 973 (D.N.J.1974), *aff'd,* 511 F.2d 910 (3rd Cir. 1975), *cert. denied,* 423 U.S. 924, 96 S.Ct. 266, 46 L.Ed.2d 249 (1975) quoting *Curley v. United States,* 81 U.S. App.D.C. 389, 160 F.2d 229, 232, *cert. denied,* 331 U.S. 837, 67 S.Ct. 1511, 91 L.Ed. 1850 (1947).

It is appropriate, before turning to a consideration of defendant's motion, to outline generally the facts elicited on the Government's case. The basic facts are not, as defense counsel observed in his opening to the jury, in material dispute.

In the Fall of 1973 plans were made for the voyage. During this period, first at the Connecticut River Marina, Chester, Connecticut, and later at the Essex Boat Yard, Essex, Connecticut, Riker, Sagarino and Blakely assisted Captain LaBrecque and Bach in readying the *Sadie and Edgar* for the voyage. This work consisted of painting the bottom of the boat, extending the rudder, installing bunks, building partitions between the engine room, midship and the crew's quarters and constructing a dodger to enclose the wheel house.

The *Sadie and Edgar* left the Essex Boat Yard on January 25, 1974. The plan of the voyage was to follow the inland waterway down to Florida, except for that segment between Sandy Hook and Atlantic City, New Jersey, where the Atlantic Ocean would have to be traversed. From January 25th to January 28th the voyage proceeded according to schedule, with the *Sadie and Edgar* arriving at New Haven, Connecticut on the 25th, City Island, New York on the 26th and Sandy Hook, New Jersey on the 27th. On January 28th, a Monday, the *Sadie and Edgar* left Sandy Hook bound for Atlantic City. On this day, as it had been throughout the voyage, the vessel was without a ship-to-shore radio.

According to the testimony of Michael Riker, the only survivor who testified on behalf of the Government, the weather was overcast on the morning of January 28th.

---

1. The court rendered its oral opinion on this motion on May 11, 1976; because of the novel issues raised by this case the court has decided

to issue a formal written opinion. *Cf. Tabatchnick v. G. D. Searle & Co.,* 67 F.R.D. 49, 52 (D.N.J.1975).

Showers had been predicted.[2] By late afternoon the sky had become very dark, the seas choppy; the wind had picked up and it had begun to rain. Riker testified that the band which held the bowsprit down to the deck of the boat was loose and that he tried several times to tighten it. These efforts were unsuccessful and the bowsprit snapped. It lay, still attached to the vessel, in the water on the right side of the boat and was banging against the side of the boat. The lower part of the foremast then snapped. The vessel, which had been taking on water, began to take on considerably greater amounts of water. Shortly thereafter the *Sadie and Edgar* ran aground on some shoals. The vessel suffered a tremendous pounding on these shoals. The waves would pick the *Sadie and Edgar* up and then drop it down hard on the shoals. This, Riker testified, happened many times. Finally, Captain LaBrecque was able to back the vessel off the shoals. But by this time the *Sadie and Edgar* had taken on too much water. The lights had started to dim and the engine was sputtering.

At this point in the evening the sinking vessel was abandoned.[3] Two lifeboats were launched, one a sixteen foot fiberglass runabout which all six persons boarded, the other an eleven foot wooden skiff. Valentine Bach attempted to start a motor which he had attached to the runabout. His efforts proved futile. Subsequently Bradford Blakely transferred into the skiff and began to tow the larger boat. Blakely soon tired and the defendant switched positions with him and began to row the skiff. A short time later the runabout capsized and all five persons in it and the dog were thrown into the water.

Mrs. LaBrecque was the first person into the skiff. Next into the skiff was the dog, who had scrambled over the shoulders of Blakely and Sagarino and was finally pushed into the skiff by the two young men. Riker, who had complained that his foul weather gear was filling up with water, also climbed aboard the skiff with the assistance of Sagarino and the defendant. The situation in the boat was that the defendant was at the oars, Mrs. LaBrecque and Riker were laying in the bow, the dog was in the well of the boat and the back bench was empty. Blakely, Sagarino and Bach were in the water hanging onto the skiff where they remained throughout the night and into the morning. No attempt was made to rotate, with the person or persons in the boat exchanging places with those in the water. Nor was any attempt made to throw the dog overboard.

Some time after dawn on the morning of January 29th first Bradford Blakely and then Paul Sagarino died in the cold waters of the Atlantic Ocean. Thereafter Bach managed to pull himself into the skiff, where he and the others remained until they were rescued at about 12:00 Noon by the *Providence Getty,* an oil tanker. The survivors were transferred to a Coast Guard cutter and taken to a hospital in Atlantic City.

Count I of the Indictment charges the defendant with violating 18 U.S.C. § 1115, which provides in pertinent part:

> Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

Defendant contends that the Government has failed to prove that the defendant was "employed" on the *Sadie and Edgar* and has further failed to prove that the *Sadie and Edgar* was engaged in commercial activity, which the defendant maintains the Government must do in order to obtain a convic-

---

2. Mrs. LaBrecque had a regular AM–FM radio on board the *Sadie and Edgar.*

3. Lieutenant Wyche of the United States Coast Guard testified that the *Sadie and Edgar* sank five hundred yards off Pullen Island.

tion under Section 1115. Defendant's argument focuses upon the following key words found in the statute: "[e]very captain, engineer, pilot, or other person *employed* on any steamboat or vessel." [emphasis added]. It is self-evident that the *Sadie and Edgar* is a vessel and that the defendant is its captain.[4] Defendant's argument is that the word "captain" must be interpreted with reference to the words "other person employed." As so interpreted, defendant submits, it becomes plain that the statute was only intended to reach the conduct of persons employed on vessels engaged in commercial activity. If the voyage commenced in January 1974 by the *Sadie and Edgar* was a non-commercial pleasure trip, then, defendant cannot be prosecuted under Section 1115.

Preliminarily it is necessary to review the testimony concerning the nature of the voyage on which the *Sadie and Edgar* set sail in January of 1974. The defendant planned a voyage from Connecticut to Florida and on to the Bahamas. There is no testimony indicating that the voyage was anything but a pleasure trip for the defendant, as well as the three young men, Michael Riker, Paul Sagarino and Bradford Blakely who joined in the voyage. Certainly the *Sadie and Edgar* carried no cargo or passengers for hire.[5] It is evident therefore that there exists insufficient evidence upon which the jury could find beyond a reasonable doubt that the *Sadie and Edgar* was engaged in a commercial voyage. Nor is there sufficient evidence to find that the defendant was employed on the *Sadie and Edgar*.

 Accordingly the court must resolve the issue whether captains of non-commercial pleasure vessels, such as the defendant Cyril E. LaBrecque, are subject to the criminal sanctions set forth in Section 1115. The defendant raises a legitimate question as to the meaning of the words employed in the statute. It is helpful to note two maxims of statutory construction which lend some assistance in the interpretation of the words. The maxim, *ejusdem generis,* limits general terms, i. e., "other person employed," which follow specific terms, i. e. "captain, engineer, pilot," to matters similar to those so specified. *United States v. Powell,* 423 U.S. 87, 96 S.Ct. 316, 319, 46 L.Ed.2d 228 (1975), citing *Gooch v. United States,* 297 U.S. 124, 128, 56 S.Ct. 395, 80 L.Ed. 522 (1936).[6] Admittedly this is not the usual case where *ejusdem generis* is employed to interpret the general term. *United States v. Insco,* 496 F.2d 204, 206 (5th Cir. 1974). Here the question is not who is an "other person employed"; rather it is whether that term limits the definition of "captain" to captains employed on vessels engaged in commercial activity. In effect, the maxim is employed in the converse. The maxim *noscitur a sociis* is employed to ascertain the meaning of an ambiguous or doubtful word, here "captain," by reference to other words with which it is associated, here "other person employed." *Jarecki v. G. D. Searle & Co.,* 367 U.S. 303, 307, 81 S.Ct. 1579, 6 L.Ed.2d 859 (1961); *Wong Kam Wo v. Dulles,* 236 F.2d 622, 626 (9th Cir. 1956). These maxims of statutory construction, *ejusdem generis* and *noscitur a sociis,* are helpful aids in construing Section 1115, and, it may be observed, supportive, though certainly not dispositive, of defendant's interpretation of the statute. But they must be

---

4. According to the testimony of Michael Riker, the defendant stated prior to the commencement of the voyage that once the voyage commenced "his decisions would be final."

5. Of some relevance in this regard is the testimony of Michael Riker:

 Q. Now, did you receive any pay, any compensation for helping Mr. LaBrecque move out of his house and for doing the work [preparing the vessel for the voyage] that you described here this morning?

 A. Well, we received no pay. But, the arrangement was, that in return for this work, he would feed us on the boat and we would be able to stay on the boat on the voyage down to Florida.

6. This maxim has particular force where, as here, the interpretation of a criminal statute is involved, since "courts are compelled to construe [such statutes] rigorously in order to protect unsuspecting citizens from being ensnared by ambiguous statutory language." *United States v. Insco,* 496 F.2d 204, 206 (5th Cir. 1974). See text, *infra.*

limited to their proper use; they cannot be employed to thwart the clear intent and purpose of the statute. *See Powell, supra.*

As originally enacted in 1838 Section 1115 was part of an act entitled "An Act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." Act of July 7, 1838, Ch. 191; 5 Stat. 304. The 1838 Act set forth licensing and safety standards for steamboats transporting goods, wares and merchandise or passengers upon the navigable waters of the United States. Section 12 of the 1838 Act is the predecessor of 18 U.S.C. § 1115. It provided:

> That every captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam, by whose misconduct, negligence, or inattention to his or their respective duties, the life or lives of any person or persons on board said vessel may be destroyed, shall be deemed guilty of manslaughter . . . . 5 Stat. at 306.

Congress's purpose in promulgating this Act was explained as follows in *United States v. Holtzhauer,* 40 F. 76, 78 (C.C.D.N. J.1889):

> Section 5344 [the predecessor of 18 U.S.C. § 1115] was enacted by congress in the proper exercise of its constitutional power "to regulate commerce with foreign nations and among the several states," and it was early decided by the supreme court of the United States that this power included the power to regulate navigation as connected with the commerce of foreign nations and among the states. *U. S. v. Coombs,* 12 Pet. 72, [9 L.Ed. 1004]; citing and reaffirming *Gibbons v. Ogden,* 9 Wheat. 189, [6 L.Ed. 23]. . . .
>
> Its purpose was to establish a supervision over the conduct of the officers and other persons employed on any steam-boat or vessel navigating the waters of the United States . . . .

The 1838 Act was plainly intended to reach vessels engaged in commerce. Its purpose was to act as a deterrent to "[t]he frequent loss of human life in consequence of explo-sions of the boilers of steamboats, of collisions and the burning of steamboats on [the] western waters . . . ." *Charge to Grand Jury,* 30 F.Cas. 990, 991 (No. 18,-253) (E.D.La.1846); *see also United States v. Warner,* 28 F.Cas. 404 (No. 16,643) (C.C. D.Ohio 1848).

Section 12 of the 1838 Act was reenacted in its present form in 1909. Act of Mar. 4, 1909, 60th Cong., Ch. 321, § 282; 35 Stat. 1144. The 1909 Act is virtually identical to the prior statute, one difference being that vessels other than steamboats are now included within its ambit, this reflecting technological developments.

Prosecutions under Section 1115 have charged captains and other employees of vessels engaged in the commercial venture of carrying passengers for hire. *E. g., Holtzhauer, supra; United States v. Keller,* 19 F. 633 (C.C.D.W.Va.1884); *United States v. Abbott,* 89 F.2d 166 (2nd Cir. 1937). For example in *Abbott* the chief engineer and master of the *Morro Castle,* a steamship carrying 318 passengers and 231 crew which sank in the Atlantic Ocean off the coast of New Jersey due to fire, causing the death of some 100 persons, were prosecuted. With but one exception, Section 1115 has been applied exclusively in the context of commercial vessels. In *Hoopengarner v. United States,* 270 F.2d 465 (6th Cir. 1959) the owner of a pleasure boat was prosecuted for recklessly operating a motorboat while drunk and causing the death of a person in another pleasure boat with which he collided. *Hoopengarner* is the only such prosecution reported. In that case the issue posed here, the applicability of Section 1115 to a non-commercial vessel, was not raised. While *Hoopengarner* implicitly sanctioned the prosecution of a pleasure boat owner, it seems to represent an unwarranted (and perhaps unintentional) extension of the statute to cover a type of situation not intended by Congress. This court does not find *Hoopengarner* persuasive in light of the purpose and history of the legislation as well as the ambiguity of its words.

Section 1115 was, as noted, designed to punish persons employed on commercial

vessels carrying persons for hire. If Congress had intended to punish persons operating non-commercial pleasure vessels, by whose misconduct, negligence, neglect or inattention human life is destroyed, it could have plainly stated: "any person operating any vessel" and defined "vessel" to include both "commercial and non-commercial pleasure" vessels.

The court takes cognizance of the different construction which the Government places upon the statute, namely that the statute is intended to reach all captains of vessels. Certainly if the policy of the statute is to impose a rigorous standard of care upon those persons operating vessels, there is much to be said for the Government's position. The answer to the question of which construction of the statute should prevail, the Government's or the defendant's, is not without doubt, though the court is inclined, for the reasons already stated, to find defendant's argument more persuasive. When Section 1115 is considered with reference to certain canons of construction applied to criminal statutes, the proper disposition of defendant's motion for a judgment of acquittal on Count I becomes evident.

■■ It is a familiar principle that criminal statutes are to be construed strictly in favor of the defendant. *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 3 L.Ed.2d 1041 (1959); *United States v. Resnick*, 299 U.S. 207, 209, 57 S.Ct. 126, 81 L.Ed. 127 (1936); *United States v. Ortega*, 517 F.2d 1006, 1009 (3rd Cir. 1975). Ambiguities or doubts should be resolved in favor of the defendant. *Rewis v. United States*, 401 U.S. 808, 812, 91 S.Ct. 1056, 28 L.Ed.2d 493 (1971); *accord, Huddleston v. United States*, 415 U.S. 814, 830–31, 94 S.Ct. 1262, 39 L.Ed.2d 782 (1974); *United States v. Bass*, 404 U.S. 336, 347, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *Ortega, supra*. As stated in *United States v. Universal C.I.T.*

*Credit Corp.*, 344 U.S. 218, 221–22, 73 S.Ct. 227, 97 L.Ed. 260 (1952):

[W]hen choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite. We should not derive criminal outlawry from some ambiguous implication.

Manifestly Congress has the power to punish captains of non-commercial pleasure vessels who cause the death of persons on board such vessels through misconduct, negligence or inattention. *Cf. Bell v. United States*, 349 U.S. 81, 82–83, 75 S.Ct. 620, 99 L.Ed. 905 (1955).[7] But due process requires, indeed demands, that before criminal sanctions are imposed, the legislature must speak plainly and without ambiguity, *cf. Bell, supra* at 83–84, 75 S.Ct. 620, so that "fair warning of the conduct that it makes a crime" is given. *Bouie v. City of Columbia*, 378 U.S. 347, 350, 84 S.Ct. 1697, 1701, 12 L.Ed.2d 894 (1964); *see Huddleston, supra*, 415 U.S. at 831, 94 S.Ct. 1262; *United States v. Bass*, 404 U.S. 336, 348, 92 S.Ct. 515, 30 L.Ed.2d 488 (1971); *United States v. Gaskin*, 320 U.S. 527, 530, 64 S.Ct. 318, 88 L.Ed. 287 (1944) (dissenting opinion).

■ Fundamentally what the Government attempts to do here, in effect, is to take Section 1115, which was intended to punish employees of commercial vessels whose negligent behavior causes the death of other persons, and extend it to punish a similar evil, criminal negligence allegedly committed by the captain of a non-commercial pleasure vessel. When our Constitution was still very young Chief Justice Marshall said:

It would be dangerous, indeed, to carry the principle, that a case which is within the reason or mischief of a statute, is within its provisions, so far as to punish a crime not enumerated in the statute, because it is of equal atrocity, or of kindred

7. Since pleasure and recreational activities are a vital part of the nation's commerce, the Commerce Clause, U.S.Const. Art. I, § 8, would reach pleasure vessels. *See* Federal Boat Safe- ty Act of 1971, 46 U.S.C. § 1451 et seq.; Senate Rep. No. 92–248, 92nd Cong., 1st Sess. 1, 6–7 (1971), U.S.Code Cong. & Admin.News 1971, p. 1333.

character, with those which are enumerated. *United States v. Wiltberger,* 18 U.S. (5 Wheat.) 35, 44, 5 L.Ed. 37 (1820). *See United States v. Resnick, supra,* 299 U.S. at 209–10, 57 S.Ct. 126.

The imposition of criminal sanctions is a most serious matter. "[B]ecause criminal punishment usually represents the moral condemnation of the community, legislatures and not courts should define criminal activity." *Bass, supra, see Huddleston, supra.* This court "cannot assent to . . . judicial revision of [Section 1115]." *Gaskin, supra* (dissenting opinion). Only Congress has the power to amend or clarify Section 1115. *Id.*

Strict construction of criminal statutes notwithstanding, "[t]hat principle . . . does not require distortion or nullification of the evident meaning and purpose of the legislation." *Gaskin, supra,* 320 U.S. at 529–30, 64 S.Ct. 318, 319, 88 L.Ed. 287 (majority opinion); *see Barrett v. United States,* 423 U.S. 212, 96 S.Ct. 498, 502, 46 L.Ed.2d 450 (1976); *Ortega, supra.* Because the meaning of purpose of Section 115, at least with respect to individuals such as the defendant, is less than evident (indeed it is the defendant who makes the more compelling argument as to its meaning and purpose), the rule of strict construction of criminal statutes is properly invoked here.

Thus although the defendant is a captain, he is the captain of a non-commercial pleasure vessel. Section 1115 only reaches commercial vessels. Accordingly, the defendant cannot be prosecuted under Section 1115 as a captain of a vessel.[8] Defendant's motion for a judgment of acquittal on Count I must be granted.

Count II charges the defendant with violating 18 U.S.C. § 1112, which provides in pertinent part:

(a) [Involuntary] [m]anslaughter is the unlawful killing of a human being without malice . . . [i]n the commission of an unlawful act not amounting to a felony, or in the commission in an unlawful manner, or without due caution and circumspection of a lawful act which might produce death.

(b) Within the special maritime and territorial jurisdiction of the United States . . . .

Defendant focuses upon the word "killing" in Section 1112, the federal manslaughter statute. A "killing," defendant contends, is death caused by a trauma or wounding; it connotes the destruction of life caused by bodily injury. Essentially defendant argues that he committed no act of violence directed against the victims,[9] and that consequently there can be no killing where the defendant is charged only with omissions—failing to carry a radio, failing to rotate the people in the water into the boat and refusing to throw the dog overboard.

■ Manslaughter may consist of an affirmative act, *United States v. Pardee,* 368 F.2d 368, 374 (4th Cir. 1966) (driving an automobile). But an omission to act may also constitute manslaughter. *State v. O'Brien,* 32 N.J.L. 169, 171 (1867) (failure to properly tend to railroad switch); *State v. Ireland,* 126 N.J.L. 444, 445, 20 A.2d 69, 70 (1941), *appeal dismissed,* 127 N.J.L. 558, 23 A.2d 560 (1942) (building collapse caused by architect's preparation of defective plans, neglect and violation of building code).[10] In *Commonwealth v. Welansky,* 316 Mass. 383, 397, 55 N.E.2d 902, 909 (1944) the defendants were convicted for manslaughter for a

---

**8.** Nor can defendant be prosecuted under the second part of Section 1115, which reaches owners, charterers, inspectors or other public officers who through neglect or misconduct cause the death of another; and is designed to impose standards of care (the violation of which trigger criminal sanctions) upon another category of persons, those who allow unsafe commercial vessels to sail, as distinguished from those who navigate and operate such vessels.

**9.** The evidence adduced on the Government's case is fully supportive of this argument.

**10.** *See State v. Gooze,* 14 N.J.Super. 277, 282, 81 A.2d 811, 814 (App.Div.1951); *State v. Diamond,* 16 N.J.Super. 26, 31, 83 A.2d 799, 802 (App.Div.1951).

fire which occurred in their nightclub. The court observed:

> [W]here as in the present case there is a duty of care for the safety of business visitors invited to premises which the defendant controls, wanton or reckless conduct may consist of intentional failure to take such care in disregard of the probable harmful consequences to them or of their right to care.

Omissions to act, as are charged here and as distinguished from a trauma or wounding, may thus constitute involuntary manslaughter under Section 1112.

Moreover, "killing" must be read with reference to the definition of "involuntary manslaughter" found in Section 1112, the commission of a lawful act which might produce death "without due caution and circumspection." Certainly failures or omissions to act, so characteristic of the law of negligence, fall within the ambit of Section 1112 which punishes criminal negligence.

■ For the Government to prevail under Section 1112 it must prove gross negligence on the part of the defendant. *Pardee, supra* at 374; *accord, State v. Chapman,* 101 F.Supp. 335, 341 (D.Md.1951). In *Pardee, supra,* quoting *Chapman, supra,* gross negligence was distinguished from the simple negligence which would give rise to civil liability:

> [T]he amount or degree or character of the negligence to be proven in a criminal case is *gross* negligence, to be determined on the consideration of all the facts of the particular case, and the existence of such gross negligence must be shown beyond a reasonable doubt. If the resultant deaths were merely accidental or the result of a misadventure or due to simple negligence, or an honest error of judgment in performing a lawful act, the existence of gross negligence should not be found.

*See* Wechsler, "Codification of Criminal Law in the United States: The Model Penal Code," 68 *Colum.L.Rev.* 1425, 1438 (1968).

The *Pardee* Court further characterized gross negligence as "a wanton or reckless disregard for human life." 368 F.2d at 374. *But cf. United States v. Dixon,* 135 U.S. App.D.C. 401, 419 F.2d 288, 293 n. 6 (1969) (concurring opinion).

■ Concerning the issue of gross negligence the Government has introduced evidence to the effect that the rigging on the vessel was slack or loose and that the hull was in a state of disrepair. The defendant had been advised by persons who had sailed the New Jersey coast many times not to travel those waters in January. Further, the three young men who made up the crew were not experienced sailors. Although the defendant had been advised of the critical importance of having a ship-to-shore radio on board,[11] and although he had promised the father of Paul Sagarino that a radio would be on board, he made the voyage without a radio. When the ship sank he was able to set off flares, but he was unable to radio for help. Lieutenant William Wyche of the Coast Guard testified that the Coast Guard Manning Stations at Atlantic City and Beach Haven monitor ship-to-shore AM and FM radio stations on a twenty-four hour basis for distress signals. If a distress signal had been received from the *Sadie and Edgar,* the Coast Guard could have reached the vessel in one hour. Certainly the evidence concerning the absence of a radio is sufficient, by itself, to take the case to the jury on the issue of gross negligence.

Michael Riker testified that after the *Sadie and Edgar* and the runabout sank, no attempt was made, despite frequent requests, to rotate with those in the water exchanging places with those in the boat. Captain LaBrecque answered the requests by stating that the skiff could not hold any more persons and that to attempt rotation would capsize it. However, Riker testified that after Paul Sagarino and Bradford Blakely died, Valentine Bach, who weighed approximately 210 pounds climbed aboard

---

11. Richard Davidson, a consultant at the Essex Boat Works with experience sailing the New Jersey coast, testified that he advised the defendant: "under no circumstances go beyond Sandy Hook without a radio."

the skiff. Riker further testified that he felt rotation was possible after sunrise, since the waters had calmed considerably. Finally, no attempt was made to throw the dog, who weighed approximately 70 pounds, overboard, despite requests from those in the water that this be done so that an additional person could come aboard the skiff.

Whether the judgments made by Captain LaBrecque constitute gross negligence is an issue the jury will ultimately decide. At this stage in the proceedings only the Government has presented its case. The jury has yet to hear from the defense. Presumably the evidence presented by the defense, assuming that evidence is presented,[12] will place the defendant's conduct in a different light. At this juncture the court need only, and does only, determine that the Government has presented sufficient evidence suggesting defendant's gross negligence to take this case to the jury.

Count III charges the defendant with violating 46 U.S.C. § 1461(d), which provides:

No person may use a vessel, including one otherwise exempted by section 1453(c) of this title, in a negligent manner so as to endanger the life, limb, or property of any person. Violations of this subsection involving use which is grossly negligent, subject the violator, in addition to any other penalties prescribed in this chapter, to the criminal penalties prescribed in section 1483 of this title.

Section 1461(d) is part of the Federal Boat Safety Act of 1971. 46 U.S.C. § 1451 et seq. ▮ Defendant's argument with respect to Section 1461(d) is twofold. First, relying upon Section 1454(b)(2) it is argued that this statute does not apply to vessels such as the *Sadie and Edgar,* in existence before the effective date of the Act, August 10,

1971. Section 1454(b)(2) states that while the Secretary in the Department in which the Coast Guard is operating "may not compel substantial alteration of a boat . . which is in existence," he "may require compliance or performance to avoid a substantial risk of personal injury to the public . . . ." *See* Senate Rep. No. 92–248, 92nd Cong. 1st Sess. 18–19 (1971), U.S.Code Cong. & Admin.News 1971, p. 1333. Section 1454(b)(2) merely applies to the issuing of regulations or standards by the Secretary. It cannot be read to except persons who use a vessel, which predates the Act, in a grossly negligent manner from the criminal sanction of Section 1461(d).

▮ Second, defendant argues that the defendant has not "used" the vessel as that term is defined in the statute. "Use" is defined as "operate, navigate, or employ." Section 1452(4). Defendant submits that there has been no evidence presented proving gross negligence in the operation, navigation or employment of the vessel. The focus of defendant's argument is upon Captain LaBrecque's actions at sea rather than the condition of the vessel and experience (or inexperience) of its crew prior to the commencement of. the voyage.

This view of "use" is far too restrictive. The Government presented evidence that the defendant sailed in winter with an inexperienced crew on a vessel whose rigging was improperly maintained. The *Sadie and Edgar* left Sandy Hook on January 28, 1974 without a radio. Sufficient evidence was presented indicating that the defendant was operating and navigating the vessel in a grossly negligent manner to deny defendant's motion for a judgment of acquittal.[13]

To summarize, defendant's motion for a judgment of acquittal is granted as to Count I, but denied as to Counts II and III.[14]

---

12. The defendant, of course, is presumed innocent until proven guilty, and bears no obligation to present any evidence at all.

13. See textual discussion under Count II, *supra.*

14. On May 14, 1976 the jury returned a verdict of Not Guilty on the two remaining counts.