## Case No. 15,458.

### UNITED STATES v. JACKSON.

[4 N. Y. Leg. Obs. 450.]

District Court, S. D. New York. Nov. 30, 1841.

SHIPPING — PUBLIC REGULATIONS — INSPECTION — LICENSE—FERRYBOAT.

1. Congress has power to regulate the build and equipment of vessels within the United States, whether or not they are engaged in commerce with foreign nations or among the several states.

2. The act of congress of July 7, 1838 [5 Stat. 304], embraces vessels of all descriptions propelled wholly or in part by steam. Sections 8 and 9 of the act do not limit its operation to vessels engaged at sea, or on the Great Lakes.

3. A steamboat owned by citizens of this state, and exclusively employed as a ferryboat on waters within the limits of the state, is bound to take out a license and have inspection under the act.

4. The steamboat in this case condemned to pay a penalty of $500, for running over a ferry without previous inspection and license.

[This was an action of debt, for a penalty, against Daniel Jackson.]

F. F. Marbury, for the United States.
W. C. Noyes, for defendant.

BETTS, District Judge. The United States prosecute an action of debt against the defendant as owner or master of a steamboat, demanding a penalty of $500, under the provisions of the act of congress entitled "An act to provide for the better security of the lives of passengers on board vessels propelled in whole or in part by steam," approved July 7, 1838. The declaration alleges that the defendant, being master or owner of a steamboat named the Daniel Jackson, duly licenced at this port, used and employed her on the East river, on the navigable waters of the United States, in the transportation of goods, wares, and merchandize, and passengers, between the city of New York and the village of Williamsburgh,

in the county of Kings; but utterly failed, neglected, and refused to have her inspected, from December 1, 1839, to January 1, 1840, as required by the said act, or to deliver to the collector a certificate of such inspection within twelve months from the date of said act, &c.

The defendant pleaded that, during the period in the declaration mentioned, he was a citizen and actual resident of the state of New York, and that the said steamboat was an ordinary ferryboat, used and employed by him to keep up and maintain a ferry, licenced by and under the authority of the city of New York, between that city and Williamsburgh, in the county of Kings; and that the said steamboat was never used or employed for any other purpose whatsoever, or on any other waters than the East river, lying exclusively within the limits of the state of New York. To this special plea the plaintiffs demurred.

The steamboat had been duly licenced under the existing laws by the owner. The sixth section of the act makes it the duty of the owners of steamboats to have the hulls inspected once in every twelve months, and the boilers and machinery once in every six months, and to deliver to the collectors of the port a certificate of such inspections; and on failure, to forfeit the licence and be subject to $500 penalty.

The questions raised under the demurrer are, whether the provisions of the act apply to this vessel, which is owned and navigated wholly within this state, and employed only as a ferryboat; and, if the act has that extent, whether congress had constitutional power to pass and enforce it.

The opinion of the court will be directed to these inquiries: 1. Are the provisions of the act restricted to steam vessels engaged in the transportation of freight and passengers at sea, or on the Lakes Champlain, Ontario, Erie, Huron, Superior, and Michigan? 2. If the act is not so limited, does it embrace any vessels other than those subject to be enrolled and licenced under the laws then in force? 3. Has congress power to legislate over vessels exclusively employed within a state and on its waters, and especially over ferryboats?

Although these inquiries involve legal propositions of considerable importance, I apprehend they may be satisfactorily answered, without any elaborate examination or discussion. It appears to me most manifest, upon the face of the statute, that congress did not mean this new legislation to be limited to any particular class of steam vessels, or to those employed in any particular localities. The first section makes it the duty of all owners of steamboats to take out new licences. The second section forbids the owner of any steamboat, to transport merchandize or passengers in or upon the bays. lakes, rivers or other navigable waters of the United States, without obtaining the licence re-

quired by the act. The third section requires the appointment of inspectors, on the application of the masters or owners of any steamboat, &c., &c., and the fourth and fifth sections direct inspections and certificates in respect to any steamboat, &c., &c. The sixth section makes it the duty of owners and masters of steamboats to cause such inspections to be made, &c. The seventh section regulates the management of any steamboat, as to discharge of her steam, &c. The ninth section enacts, that iron rods or chains shall be employed and used in the navigation of all steamboats, instead of wheel or tiller ropes. The tenth section makes it the duty of the master or owner of every steamboat running in the night to carry signal lights: and the twelfth section subjects to criminal prosecution for manslaughter, any captain, pilot, &c., employed on board any steamboat, by whose negligence or misconduct life is lost, &c.

The rule of construction contended for by the defendant, that general words of a statute are to be controlled by subsequent restraining ones, is not to be questioned; but, to have that effect, the restraining words or clause must have evident relation to the whole subject matter; otherwise they are to be understood as supplementary, or exceptive to the main provisions. In view of these principles of construction, the provisions of sections 8 and 9 are, in my opinion, not to be regarded as restricting the general operation of the act; but as providing additional regulations in respect to steam vessels employed at sea and on the Great Lakes. Every steam vessel engaged in the transportation of merchandize or passengers, at sea or on the lakes named, must be supplied with particular boats or yawls, and fire engines and apparatus. It seems to me plain, upon the language of these sections, that the intention of congress was, to compel that class of vessels, besides conforming to the general requirements of the statute, furthermore to equip themselves in reference to the dangers of the navigation they pursue, and which might be regarded as more imminent to them, remote from aid and succor, than to vessels employed on inland waters; and it is to be remarked, when this special purpose is satisfied, the ninth section, with only the break of a semicolon in the clause, drops the limitation of "every steamboat so employed," and, taking up again the general phraseology before used, directs that "iron rods or chains shall be used in the navigation of all steamboats, instead of wheel or tiller ropes, under a penalty of $300." In suits heretofore brought in this court to enforce that penalty, against boats navigating Long Island Sound and the North river, it has been held that they fell within the provisions of the clause, and that it was not to be construed as having relation only to the boats particularly referred to in sections 8 and 9. U. S. v. Stone [Case No. 16,407]. I think it follows, plainly, from the

analysis given of the statute, that congress contemplated a system of regulations to govern every description of steam vessels; and I adhere to the former opinion expressed, that every steamboat, wherever employed, is liable to the penalties of the act on disobeying it; unless it be shewn that congress had no power to establish these regulations, or has, by implication, limited them to particular vessels.

2. It was earnestly insisted that the first and second sections of the act distinctly indicate the intent of congress, to bring under its provisions only those steam vessels which at the time were subject to be enrolled and licenced by the existing laws; and these, it is contended, can be no other than vessels engaged in the coasting trade or foreign commerce; and accordingly the general terms, "all and every," used in different parts of the act, must be so qualified. Although this point is substantially involved in the first, and must be disposed of under the principle governing that, yet, perhaps, it demands a special consideration. The reference to existing registry and licence laws, is supposed to adopt the provisions of those acts as criteria of the description and employ of steamboats made subject to the regulation of the present statute, and thus indirectly to establish a restriction or qualification to the general operation of the act. The second section obviates the question made under the first, whether the statute was designed to operate prospectively, or must be limited to boats at the time actually licenced; because it interdicts the employment of boats, after the succeeding October, without having first obtained a licence, &c. The new licence, therefore, required by the first section, must be understood to be that particular document pointed out by this statute, and not merely a reissue or renewal of one existing at the time. But a construction restrained to the strictest meaning of the words would not aid the defendant; because, by the pleadings, it stands admitted that this steamboat had before taken out a licence under the laws of the United States. The argument, however, is, that the boat is no way compromitted by taking a previous licence; as there was no obligation on her part to seek it, and no authority in law in the collector to grant one. The position is undoubtedly correct, that the defendant cannot be made liable to the penalties of the statute because of a step by him or the custom house, not exacted nor authorized by the existing laws. But I do not accede to the proposition of the defendant, that the act of 1838 must be interpreted in subordination to the laws then in force, in respect to the enrolment and licencing of vessels, so that no vessel can fall within its provision unless she was previously obliged to be licenced or enrolled. And it is to be remarked, in this connection, that there is manifestly a misapprehension of the effect

and object of our registry and licence laws. Those laws, up to this period, had never been imperative or mandatory in this respect. They imposed penalties and disabilities on vessels not documented according to their provisions. Such vessels might, without those papers, be rendered in a degree useless in the general business of navigation and trade; but it was no condition to their employment, or to a right of property in them, that they should possess any of those documents. Livingston v. Van Ingen [9 Johns. 507]; 17 Johns. 488. An examination of the legislation of congress on this subject shows, that the laws were not framed with a view to coerce shipowners to register and licence their vessels, but rather to secure American bottoms special advantages, when their nationality was evidenced by proper ship papers; with, perhaps, the further purpose of securing them a right of navigation within the states, independent of state legislation. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 203; 5 Cow. 562. The numerous acts passed from the First congress to this time, proffer privilege and inducements to sail and steam vessels taking the documents, and visit with disabilities and penalties those who fail to conform to the laws,—without, however, placing them under obligation to do so. Acts Sept. 1, 1789, c. 11 [1 Stat. 55]; Sept. 29, 1789, c. 22 [Id. 94]; December 31, 1792, c. 146 [2 Bior. & D. Laws, 313; 1 Stat. 287, c. 1]; February 18, 1793, c. 153 [2 Bior. & D. Laws, 332; 1 Stat. 305, c. 8]; March 3, 1803, c. 331 [3 Bior. & D. Laws, 534; 2 Stat. 209, c. 18]; March 7, 1794, c. 5 [1 Stat. 342]; Feb. 25, 1804, c. 370 [3 Bior. & D. Laws, 574; 2 Stat. 259, c. 17]; March 27, 1804, c. 405 [3 Bior. & D. Laws, 618; 2 Stat. 296, c. 52]; March 3, 1813 [2 Stat. 809]; March, 1825, c. 101 [4 Stat. 129]; March 3, 1831, c. 576, 4 Stat. 492], and April 4, 1840, c. 6 [5 Stat. 370]. Still, if the interpretation of these statutes should be that an obligation on owners to comply with them must be implied, this act of July 7, 1838, will be found the first which positively enjoins their taking out a licence, and enforces a direct and heavy penalty for omitting to comply. This distinction would be sufficient to show that congress did not intend to make the last act subordinate to, or merely concurrent with, the former ones. Independent of that consideration, the subject matter and the terms of the enactments plainly evince that congress, in the act of 1838, meant to establish a new and independent system, entire and perfect in itself, both as to its objects and the particulars upon which it was to operate. The reference to antecedent acts need not be understood as doing more than adopt the methods there prescribed, in making enrolments and taking out licences. The first section directs "a new enrolment under the existing laws," and "to take out a new licence under such conditions as are now imposed by law." The second section prohibits the use of steam vessels, without having first obtained "a licence under the existing laws, and without having complied with the conditions imposed by this act." All these directions are satisfied by pursuing, in obtaining the papers, the manner and form fixed by former acts. This is a familiar mode of legislation, and the obvious meaning of the language would seem to look to antecedent acts only for a description of ship's papers, and the method of procuring them; and it would be a forced construction to hold that congress intended, in that way, to limit this act to the kind of vessels which could obtain licences under previous laws. On this branch of the defence, I am accordingly of opinion that the steamboat in question falls within the requirements of the act, irrespective of her right or liability to enrolment or licence under former laws.

3. The last general topic touches the competency of congress to pass a law which would compel this boat to take out a licence. The positions urged by the defendant are (1) that congress has no power to legislate over vessels owned exclusively within a state, and navigating only the waters within such state; and (2) that to enforce the act against this boat would be to regulate a ferry,—a matter not within the constitutional authority of congress.

(1) The "East River," as it is termed, is an arm of the sea connecting Long Island Sound and the Bay of New York. It has no property of a river. Its waters are all supplied by the sea, its source and outlet being both in the ocean. To all purposes, this strait comes within the description of navigable waters of the United States. 3 Kent, Comm. 412. The admiralty law embraces it, and it moreover comprises the transit to and from the navy yard, and a haven for the commercial and national marine of the United States. The jurisdiction of the general government embraces all tide waters navigable from the sea. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 203; 3 Cow. 747; [Peyroux v. Howard] 7 Pet. [32 U. S.] 324; [City of New York v. Miln] 11 Pet. [36 U. S.] 125; [U. S. v. Coombs] 12 Pet. [37 U. S.] 76. Jurisdiction over a place ordinarily includes, as an incident, jurisdiction over persons and things therein. 1 Kent, Comm. 430. Without, however, looking to the admiralty power of congress, or its authority resulting from the locality of these waters, I am satisfied, full power to legislate over the subject in question is found in the authority to regulate commerce given by the constitution. Article 1, § 8. The supreme court has considered most deliberately the force and extent of this grant of power, and, as applicable to the point under consideration, it must be regarded as settled, on the highest judicial authority, that the power to regulate commerce includes, and is in fact, a power to regulate navigation. Gibbons v.

Ogden, 9 Wheat. [22 U. S.] 1, 203; 1 Kent, Comm. 436. It comprehends navigation within the states as well as abroad, and is plenary and absolute within its acknowledged limits. Id.; 3 Cow. 747; 1 Wend. 560; Nelson v. Blackbird Creek Co., 3 Pet. [28 U. S.] 245. The case of Gibbons v. Ogden [supra] fortifies that exposition of the constitutional provision, by illustrations and exceptions meeting every case of practical importance which has since arisen, and demonstrates that the great doctrine of that power comprehends navigation of every character effected by wind, steam or other method of propulsion, and engaged in the transportation of merchandize or passengers. City of New York v. Miln, 11 Pet. [36 U. S.] 102; Brown v. State of Maryland, 12 Wheat. [25 U. S.] 419; The Wilson v. U. S. [Case No. 17,846]. Chief Justice Marshall, in his circuit, discussed the subject at large, and held that the power of controlling navigation is incidental to the power to regulate commerce; and that thereby the power over the vessel becomes co-extensive with that over her cargo, or objects of importation. The Wilson v. U. S. [supra.] It is not supposed that the power of congress to establish navigation laws can be called in question at this day. These laws, during the whole period of the government, have been enforced as a cardinal part of national polity. Such laws, in their nature, have relation to the capacity and structure of vessels, as well as to the business or places in which they may be engaged. Navigation laws, under our system, will accordingly embrace vessels running, in fact, wholly over state waters,—because it may be the interest and option of owners to keep vessels of all classes employed where they reside, although of dimensions and equipment fitting them for sea voyages; and it is not to be assumed that a vessel falls under or stands exempt from the operation of navigation laws, because of the particular business she pursues, or the places of her employment.

It is urged that congress can exercise no regulation over navigation, except when it is immediately connected with, and incidental to commerce with foreign nations or among the several states; and that, consequently, no other vessels are subject to the authority of congress in this behalf, than such as are shown to be employed in such commerce. This position is sustained by no authority. The power of congress is not limited to controlling exports and imports—to the cargoes of vessels; but it equally extends to and governs intercourse itself. Commerce, in the sense of the constitution, is not trade only; and navigation, as the instrument and incident of commerce, is so in relation to intercourse as well as trade. The power to enact navigation laws imports a power to give those laws their essential vitality and effect. A primary ingredient in the system is, that it acts directly upon vessels, fixing the mode

of their construction—their muniments of ownership and national character—the quality and number of officers and crew to be supplied for their navigation and such other equipments as may be appropriate to the service in which they are engaged; and, perhaps, in addition, subjecting them to inspection and condemnation when not seaworthy or safely equipped. Such laws necessarily control and regulate the vessel, irrespective of her employment. She becomes subject to the regulation before being put in motion, or receiving a crew or cargo; because the power to regulate navigation or intercourse, may be exercised in limiting it or inhibiting it entirely. Restrictions and interdictions, partial or total, are regulations of intercourse equally with rules which allow and govern it in its prosecution. 2 Story, Const.' §§ 1057, 1058, 1060, 1062. I am accordingly of opinion that the act of 1838 is valid, and operative in respect to vessels therein designated, without regard to their employment as coasting or sea-going vessels, or in carrying on trade or traffic with foreign nations or among the several states.

(2) Does then her actual occupation as a ferry-boat exempt this vessel from the operation of the act? No one will contend that congress has power to regulate ferries. This is matter of municipal provision, and rests exclusively with the states. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 1; [City of New York v. Miln] 11 Pet. [36 U. S.] 102. To regulate a ferry imports a power over territory and persons, to grant a franchise, to impose contributions and lay restrictions. Congress exercises no such powers directly within the states. Yet, in the exercise of constitutional powers, congress may, by its laws, incidentally or indirectly interfere with and effect a ferry grant equally with other subjects of state legislation. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 1; [Brown v. U. S.] 12 Wheat. [25 U. S.] 419; [City of New York v. Miln] 11 Pet. [36 U. S.] 102. The grant of a ferry between New York and Albany or intermediate places, with exclusive right to run particular boats on it, or carry all description of merchandize or persons, would be countervailed and abrogated by a licence or importation under the revenue laws of the United States. [Gibbons v. Ogden] 9 Wheat. [22 U. S.] 1; [Brown v. U. S.] 12 Wheat. [25 U. S.] 419; [City of New York v. Miln] 11 Pet. [36 U. S.] 102; 3 Cow. 747. So would any ferry grant, I apprehend, by enactments in respect to the establishments of ports, the transportation of the mail, &c., &c.; the rule being that legislation by congress over subjects within its constitutional power is necessarily absolute and exclusive, superceding and controlling all state regulations directly or incidentally in conflict with it. If then this statute acts upon the business of ferrying, it is indirectly, and because proprietors of ferries seek to employ on them boats subject to

the regulation of the general government. Congress neither assumes to regulate ferries or prescribe regulations peculiar to ferries. A law governing the structure and outfit of steam vessels has no necessary application to ferries, and affects them only when such boats are put in their service. Boats used upon a ferry constitute no part of a ferry franchise. A grant of a ferry by the state to be served by steamboats alone, would not connect the boats with the grant, so as to impart the privileges of a franchise in respect to them. I am accordingly of opinion that the exception to the constitutionality of the act, on the ground that it applies to vessels employed on ferries, cannot be maintained. There can be no good reason for supposing that congress intended to have steamboats employed on ferries excused from a compliance with this law. The act proposes, by means of careful inspection of the hulls and machinery of steamboats, to preserve the lives of passengers transported in them. Where are the dangers from disasters to steamboats so extensive and fearful, as on the great thoroughfares where thousands of persons are constantly within the perils of that mode of navigation? It is not to be inferred that these precautionary provisions were established to protect the comparative few, at that day, navigating the ocean or Great Lakes in steam vessels; and that congress was unmindful of the imminent and calamitous perils to which vast multitudes are hourly exposed on board steamboats making their passages between our populous towns, and from one edge to the other of rivers and harbors. Neither is it to be implied that ferry boats are exempt from the act, because of the dimensions of the boats, or the short distances they run. Ferries often extend over many miles, and boats of great capacity and strength are employed upon them. This boat and many others employed on ferries across the harbor of New York, are of strength and dimensions sufficient to carry large freights or perform voyages from or to distant ports. It is notorious that they are often employed, even in winter, for the relief of ships going out or coming in from sea, on occasions where great strength in the boat and her machinery are indispensable. And it was manifestly this domestic service of steamboats, in harbors or on rivers, which was best known to congress when this law was enacted; and it is to be presumed they designed to aid, by force of this law, in rendering it more secure to life and property.

On the whole case, I am of opinion, congress has the constitutional power to require steamboats to be licenced or inspected, without regard to the business they follow or the places they run between, and that boats wholly engaged on ferries within a state, and owned in such state, are subject to the law. I accordingly pronounce against this vessel, and condemn her to pay the penalty of $500 demanded, with costs of suit.