# United States Court of Appeals
## For the Eighth Circuit

_____

No. 20-3671
_____

United States of America

*Plaintiff - Appellant*

v.

Kenneth Scott McKee; Charles V. Baltzell; Curtis P. Lanham

*Defendants - Appellees*

_____

Appeal from United States District Court
for the Western District of Missouri - Joplin

_____

Submitted: September 23, 2021
Filed: May 30, 2023

_____

Before KELLY, ERICKSON, and GRASZ, Circuit Judges.

_____

KELLY, Circuit Judge.

On July 19, 2018, 17 people were killed after *Stretch Duck 7*, a commercial tourism duck boat operating on Table Rock Lake in the Ozarks, sank during a storm. The government charged Kenneth Scott McKee, the captain of *Stretch Duck 7*, and Charles V. Baltzell and Curtis P. Lanham, managers of the duck boat company, with felony counts of "seaman's manslaughter" under 18 U.S.C. § 1115 and misdemeanor counts of operating a vessel in a grossly negligent manner under 46 U.S.C.

§ 2302(b). In the 47-count second superseding indictment charging McKee, Baltzell, and Lanham (collectively, Defendants), the government alleged that the charged offenses occurred on "Table Rock Lake, a navigable water of the United States within the Western District of Missouri and within the admiralty jurisdiction of the United States." Defendants jointly moved to dismiss the indictment, arguing that it alleged only admiralty jurisdiction, and that the district court's admiralty jurisdiction does not extend to crimes occurring on Table Rock Lake because the lake is not "navigable" as a matter of law under Eighth Circuit precedent.

The district court[1] held a hearing on the motion, where the parties submitted evidence in writing pursuant to stipulation. On December 3, 2020, the district court granted Defendants' motion to dismiss, adopting a report and recommendation that concluded the prescriptive reaches of 18 U.S.C. § 1115 and 46 U.S.C. § 2302(b) are defined by admiralty law and do not cover the conduct alleged because Table Rock Lake does not fall under the court's admiralty jurisdiction.

The government now appeals the dismissal of the indictment. We have jurisdiction under 18 U.S.C. § 3731.

I.

We review a motion to dismiss an indictment de novo. United States v. Metcalf, 881 F.3d 641, 644 (8th Cir. 2018). "In doing so, we accept the allegations stated in the indictment as true, and ask whether they can form the basis of the charged offense." United States v. Hansmeier, 988 F.3d 428, 436 (8th Cir. 2021) (citation omitted). Where factual findings are required, we review them for clear error. See United States v. Iron Crow, 970 F.3d 1003, 1008 (8th Cir. 2020).

---

[1]The Honorable M. Douglas Harpool, United States District Judge for the Western District of Missouri, adopting the report and recommendation of the Honorable David P. Rush, Chief Magistrate Judge, United States District Court for the Western District of Missouri.

II.

On appeal, the government argues that the district court erred in finding that 18 U.S.C. § 1115 and 46 U.S.C. § 2302(b) were enacted pursuant to Congress's authority to create and modify admiralty laws and thus reach only conduct occurring within the court's admiralty jurisdiction.[2] We address each statute in turn.

A.      18 U.S.C. § 1115

Today, 18 U.S.C. § 1115 reads:

Every captain, engineer, pilot, or other person employed on any steamboat or vessel, by whose misconduct, negligence, or inattention to his duties on such vessel the life of any person is destroyed, and every owner, charterer, inspector, or other public officer, through whose fraud, neglect, connivance, misconduct, or violation of law the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.

---

[2]The government also argues that because the district court found that it had subject matter jurisdiction to hear this case under 18 U.S.C. § 3231, it erred in further considering the prescriptive reach of the charged statutes under admiralty law. In the government's view, the district court's jurisdictional inquiry should have ended when it recognized that it had subject matter jurisdiction under § 3231. But the district court's jurisdictional inquiry did just that: The court concluded at the outset that it had subject matter jurisdiction over this case because the defendants were charged with "offenses against the laws of the United States." 18 U.S.C. § 3231. Its subsequent discussion about admiralty jurisdiction addressed a separate question— namely, whether 18 U.S.C. § 1115 and 46 U.S.C. § 2302(b) cover only those offenses that are committed on bodies of water that fall within the federal courts' admiralty jurisdiction, or whether the statutes' ambit is broader. See United States v. Prado, 933 F.3d 121, 132–38 (2d Cir. 2019) (explaining the distinction between a court's subject matter jurisdiction, or "the question whether a case comes within the judicial power of the court," and questions of "jurisdiction" that instead concern the "scope, reach, or coverage" of a federal criminal statute).

When the owner or charterer of any steamboat or vessel is a corporation, any executive officer of such corporation, for the time being actually charged with the control and management of the operation, equipment, or navigation of such steamboat or vessel, who has knowingly and willfully caused or allowed such fraud, neglect, connivance, misconduct, or violation of law, by which the life of any person is destroyed, shall be fined under this title or imprisoned not more than ten years, or both.

But the text of the seaman's manslaughter statute does not resolve the question raised in this appeal. The statute does not include a requirement that the offense occur within the admiralty jurisdiction of the United States. Nor does it contain an express element limiting its application to conduct that has an effect on interstate commerce.[3] See United States v. Crenshaw, 359 F.3d 977, 986 (8th Cir. 2004) (observing that statutory language such as "'engaged in, or the activities of which affect, interstate or foreign commerce' indicates that Congress intended a statute to extend to the outer limits of the Commerce Clause"). We turn, therefore, to the statute's legislative history and consider "the congressional purposes underlying the Act." Offshore Logistics, Inc. v. Tallentire, 477 U.S. 207, 220–21 (1986) (reviewing the legislative history of federal admiralty legislation addressing wrongful death remedies for survivors of persons killed on the high seas).

The earliest version of the seaman's manslaughter statute "appeared in 1838 as part of an act to prevent boiler explosions on steamboats plying 'the bays, lakes, rivers, or other navigable waters of the United States.'" United States v. Allied

---

[3]The government asserts that the elements of § 1115 "limit the persons that can be charged" under the statute "to those engaged in certain economic activities that have a substantial effect on interstate commerce," but it also agrees that the statute "lack[s] . . . a jurisdictional element." The statute uses the word "employed," and at least one court has interpreted that term to limit the scope of conduct to commercial activity. See United States v. LaBrecque, 419 F. Supp. 430, 437 (D.N.J. 1976). But there is nothing on the face of the statute to limit its application to commercial activity involving interstate commerce.

Towing Corp., 602 F.2d 612, 614 (4th Cir. 1979) (quoting Act of July 7, 1838, ch. 191, § 2, 5 Stat. 304, 304). The act was entitled, "An Act to provide for the better security of the lives of passengers on board of vessels propelled in whole or in part by steam." Act of July 7, 1838, ch. 191, 5 Stat. at 304. And § 12 of the act formed the predecessor of what is now 18 U.S.C. § 1115 and imposed liability on a "captain, engineer, pilot, or other person employed on board of any steamboat or vessel propelled in whole or in part by steam." Id., § 12, 5 Stat. at 306. § 12 did not contain an express jurisdictional element tying it to one of Congress's enumerated powers, but other sections of the act contained language limiting their application to events occurring on the "navigable waters" of the United States. Id., §§ 2–3, 5 Stat. at 304.

Over the next century, the provision that would become § 1115 was moved and revised several times. In 1874, seaman's manslaughter was codified in Title 70, "Crimes," in Chapter Three, "Crimes Arising Within the Maritime and Territorial Jurisdiction of the United States." See 70 Rev. Stat. § 5344 (1874); 18 Stat. 1037–38. This chapter prescribed several crimes, including murder, traditional manslaughter, and assault. See 70 Rev. Stat. §§ 5339, 5341, 5346; 18 Stat. 1038. As is relevant here, however, these criminal statutes were limited in reach to "the admiralty and maritime jurisdiction of the United States, and out of the jurisdiction of any particular state."[4] 70 Rev. Stat. § 5339; 18 Stat. 1038. § 5344—the seaman's

_____

[4]This limitation was akin to what is now known as "special maritime and territorial jurisdiction" and is a more limited jurisdictional area contained within the general admiralty jurisdiction. It does not include navigable waters within the general admiralty jurisdiction that are also within the territorial jurisdiction of a particular state. See 18 U.S.C. § 7 ("The term 'special maritime and territorial jurisdiction of the United States', as used in this title, includes: (1) The high seas, any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State, and any vessel belonging in whole or in part to the United States or any citizen thereof, or to any corporation created by or under the laws of the United States, or of any State, Territory, District, or possession thereof, when such vessel is within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State."). We use the phrase "special maritime and territorial jurisdiction" to refer to this early jurisdictional limitation even though it was not codified as such until later.

manslaughter statute—in contrast, had no such limitation. See 18 Stat. 1038. § 5344 was amended again in 1905 to add language regarding the criminal responsibility of "the owner or charterer of any steamboat or vessel" covered by the statute, but no changes were made to its prescriptive reach. Act of Mar. 3, 1905, ch. 1454, § 5, 33 Stat. 1023, 1025.

It was not until 1909 that Congress added language expressly restricting the reach of seaman's manslaughter to the special maritime and territorial jurisdiction. See Act of Mar. 4, 1909, ch. 321, § 282, 35 Stat. 1088, 1144. Seaman's manslaughter remained in a chapter entitled "Offenses Within the Admiralty and Maritime and the Territorial Jurisdiction of the United States." Id., 35 Stat. at 1142. But that chapter was reconfigured, and the text regarding the special maritime and territorial jurisdiction was removed from individual sections. Instead, to avoid repetition, this limitation was placed in a separate section at the beginning of the chapter, and it applied to all of the "crimes and offenses defined in th[e] chapter." Id., § 272, 35 Stat. at 1142. That introductory section stated in relevant part: "The crimes and offenses defined in this chapter shall be punished as herein prescribed: First. When committed on the high seas, or on any other waters within the admiralty and maritime jurisdiction of the United States and out of the jurisdiction of any particular State . . . ."[5] Id. Because seaman's manslaughter remained "in this chapter," its scope was now limited to the special maritime and territorial jurisdiction, even though that limitation had not been placed on any previous version of the statute. See id., § 282, 35 Stat. at 1144. In 1926, the sections of the chapter were renumbered, but seaman's manslaughter was not revised. See 18 U.S.C. §§ 451, 461 (1926); 44 Stat. 498–99.

In 1948, seaman's manslaughter was moved to its current location at 18 U.S.C. § 1115. Act of June 25, 1948, ch. 645, § 1115, 62 Stat. 683, 757. It was at this point that Congress removed the special maritime and territorial jurisdiction limitation, and the statute essentially reads as it does today. The 1948 reviser's note

_____

[5]Other limitations in this section are not relevant to our analysis here.

to § 1115 explained that the change was made to "restore[] the intent of the original enactments" in both the 1874 and 1905 versions by "mak[ing] this section one of general application."  H.R. Rep. No. 80-304, at A91 (1947).

Our review of the statute's history leads us to the conclusion that the origins of seaman's manslaughter are in the admiralty jurisdiction of federal courts, see U.S. Const. art. III, § 2, and Congress's authority to pass legislation concerning matters that fall within that jurisdiction.  See Romero v. Int'l Terminal Operating Co., 358 U.S. 354, 361 (1959) (explaining that Article III "empowered Congress to revise and supplement the maritime law within the limits of the Constitution"); Crowell v. Benson, 285 U.S. 22, 39 (1932) ("[T]he general authority of the Congress to alter or revise the maritime law which shall prevail throughout the country is beyond dispute.").  From 1874 until 1948, seaman's manslaughter was codified in a chapter of statutes addressing crimes committed "within the maritime and territorial jurisdiction of the United States."  In 1905, Congress added language to clarify the criminal responsibility of corporate owners of vessels covered by the seaman's manslaughter statute, but nothing in the corresponding legislative history suggests lawmakers questioned the statute's admiralty-based jurisdictional scope.  The year before the enactment of the 1909 version of the statute, the Special Joint Committee on the Revision of Laws submitted a report on revisions to the "Crimes" title, including revisions to the chapter entitled "Offenses within the Admiralty and Maritime Jurisdiction."  H.R. Rep. 60-02, at 9–12 (1908).  The report made no mention of seaman's manslaughter specifically.  It did, however, cite to both an admiralty treatise and recent Supreme Court case law to emphasize that admiralty jurisdiction includes both civil and criminal maritime acts, and "that the admiralty jurisdiction over all navigable waters depends upon the Constitution and not upon any act of Congress."  Id. at 12.

Furthermore, in the Congressional Record of 1908, senators discussed the reconfiguration of the chapter titled "Offenses within the Admiralty and Maritime Jurisdiction."  42 Cong. Rec. 1184 (1908).  One senator expressed concern that the proposed revisions improperly expanded the jurisdiction of federal courts over

criminal conduct that was otherwise within the jurisdiction of the states. It was pointed out in response, however, that the introductory section to the revised chapter expressly limited the scope of the criminal statutes in the chapter—including seaman's manslaughter—to crimes committed in the special maritime and territorial jurisdiction of the United States. Id. at 1185–86. In short, all indications from the history of the seaman's manslaughter statute are that it was passed and revisited with attention to its scope. And that scope was, in turn, always defined by the reach of federal admiralty jurisdiction.

The most comprehensive analysis to date of the jurisdictional scope of § 1115 by a federal court appears in Allied Towing, where the Fourth Circuit similarly traced the statute's origins and development beginning in 1838 and reached a similar conclusion to ours today. 602 F.2d at 614–15. The court concluded that "[t]he history of § 1115 discloses . . . that Congress enacted this statute as an integral part of its regulation of the nation's maritime commerce," and that the statute therefore "reaches homicides committed anywhere within the general admiralty jurisdiction of the federal courts." Id. at 615. The court in Allied Towing pointed to the addition of a jurisdictional limitation to the seaman's manslaughter statute in 1909; the subsequent removal of that limitation in 1948; and the 1948 reviser's note as evidence that Congress intended the statute to cover the entirety of the general admiralty jurisdiction rather than the more limited special maritime and territorial jurisdiction. Id. at 614–15.[6]

The government views the significance of the 1948 revision differently. As the government sees it, Congress's removal in 1948 of the seaman's manslaughter statute's limitation to the special maritime and territorial jurisdictional is evidence of congressional recognition that the statute is a Commerce Clause enactment. And given the absence of any textual limitation related to admiralty and maritime

---

[6]The Fourth Circuit's understanding that § 1115's scope is defined by admiralty law is shared by the Sixth Circuit, the only other circuit court to consider § 1115's jurisdictional reach. See Hoopengarner v. United States, 270 F.2d 465, 470–72 (6th Cir. 1959) (discussing § 1115's scope in light of federal admiralty law).

jurisdiction, the government posits, § 1115's ambit extends to any covered "misconduct, negligence, or inattention" on the part of any person "employed on any steamboat or vessel" that impacts interstate commerce, irrespective of whether that criminal conduct takes place on a body of water that otherwise falls within the federal courts' admiralty and maritime jurisdiction. But the regulation of interstate commerce outside the admiralty and maritime context is not mentioned in any of the historical materials concerning § 1115 that we have found. And despite the opportunity to do so, Congress has not added an interstate commerce element to the statute in its almost 200-year existence.

"[U]ntil relatively recently criminal Commerce Clause statutes tended overwhelmingly to contain jurisdictional elements" tying the covered conduct to interstate commerce. Margaret H. Lemos, The Commerce Power and Criminal Punishment: Presumption of Constitutionality or Presumption of Innocence?, 84 Tex. L. Rev. 1203, 1227 (2006). It was not until "the late 1960s" that Congress enacted "the first criminal statutes that prohibited conduct defined entirely without reference to interstate commerce." Id. In the absence of express jurisdictional elements, these newer statutes relied instead on congressional findings that the regulated conduct substantially affected interstate commerce. Id. The Supreme Court acknowledged these two approaches to legislating criminal Commerce Clause statutes in United States v. Lopez. 514 U.S. 549, 561–63 (1995). There, the Court found the fact that the Gun-Free School Zones Act contained neither a jurisdictional element nor congressional findings supported its ultimate conclusion that the statute did not fit within Congress's Commerce Clause authority. See id. at 561 ("§ 922(q) contains no jurisdictional element which would ensure, through case-by-case inquiry, that the firearm possession in question affects interstate commerce."); id. at 563 ("[T]o the extent that congressional findings would enable us to evaluate the legislative judgment that the activity in question substantially affected interstate commerce, . . . they are lacking here."). Thus, § 1115's lack of a jurisdictional element does not necessarily support the government's position that it must be a Commerce Clause statute. To the contrary, the statute's lack of either a jurisdictional

-9-

element or congressional findings tying it to interstate commerce means it does *not* look like a typical criminal Commerce Clause statute.

In support of its position, the government also cites cases where courts expressed the view that § 1115's original 1838 precursor "was enacted by congress in the proper exercise of its constitutional power 'to regulate commerce with foreign nations and among the several states.'" LaBrecque, 419 F. Supp. at 435 (quoting United States v. Holtzhauer, 40 F. 76, 78 (C.C.D.N.J. 1889)); see United States v. Beacham, 29 F. 284, 284 (C.C.D. Md. 1886) ("The authority for the statute is to be found in the constitutional grant of power to congress to regulate commerce among the several states."); United States v. Jackson, 26 F. Cas. 559, 561 (S.D.N.Y. 1841) ("[F]ull power to legislate over the subject in question is found in the authority to regulate commerce given by the constitution."). But none of these cases examined the origins of § 1115, which was enacted as part of a broader act regulating maritime travel, or considered the provision's subsequent legislative history, which involved the addition and removal of jurisdictional limitations indicating that Congress considered it to be an admiralty statute.

Moreover, that § 1115 implicates interstate commerce as a practical matter— specifically, by targeting the misconduct of those "employed on any steamboat or vessel"—is not surprising. "[T]he primary focus" of federal admiralty jurisdiction "is unquestionably the protection of maritime commerce." Foremost Ins. Co. v. Richardson, 457 U.S. 668, 674 (1982); see Sisson v. Ruby, 497 U.S. 358, 362 (1990) ("[P]rotecting commercial shipping is at the heart of admiralty jurisdiction . . . ."). And the purpose of § 1115's earliest precursor was, by its own terms, "to provide for the better security of the lives of passengers on board of vessels" traveling on "bays, lakes, rivers" and other channels of commerce. Act of July 7, 1838, ch. 191, § 2, 5 Stat. 304. Yet the fact that a federal criminal statute impacts or touches on maritime commerce does not mean that the statute's reach necessarily extends to any conduct that Congress could arguably regulate through its Commerce Clause power.

-10-

And notably, the government alleged in its indictment that the charged offenses in this case occurred "within the admiralty jurisdiction of the United States." While it now argues that language is surplusage, see, e.g., United States v. Thompson, 6 F.4th 789, 795 (8th Cir. 2021) ("[M]ere surplusage [in an indictment] . . . may be disregarded if the remaining allegations are sufficient to charge a crime."), the indictment does not allege a connection between Defendants' conduct and interstate commerce, either.[7] We can find no case, and the parties alert us to none, where conduct occurring outside the general admiralty jurisdiction was prosecuted under § 1115.[8] We decline the government's invitation to expand the scope of a criminal statute without direction from Congress, and we conclude that the scope of § 1115 is defined by the reach of federal admiralty jurisdiction. See Cleveland v. United States, 531 U.S. 12, 24 (2000) ("We resist the Government's reading of [the statute] . . . because it invites us to approve a sweeping expansion of federal criminal jurisdiction in the absence of a clear statement by Congress."); Bond

---

[7]The 28-page second superseding indictment does not mention interstate commerce even once. We also note that when the owners of *Stretch Duck 7* initiated a civil proceeding seeking exoneration from or limitation of liability for the accident at issue here, the government moved to intervene in the civil action to "present[] its position that Table Rock Lake . . . is a navigable water of the United States subject to . . . admiralty jurisdiction." Motion to Intervene, In re Branson Duck Vehicles, LLC, No. 18-03339, Doc. 73 at 1 (W.D. Mo. Jan. 18, 2019). The government represented that "[t]he grand jury returned the indictment [in the instant criminal case] under the admiralty jurisdiction of the United States," which was "premised on the fact that Table Rock Lake was a navigable water of the United States." Id. at 2. And the government reiterated that the "prosecution was brought under the admiralty jurisdiction of the United States." Id. at 5. The district court in the civil action denied the government's motion and ultimately dismissed the civil action for lack of admiralty jurisdiction. Order, In re Branson Duck Vehicles, No. 18-03339, Doc. 311 at 4-5 (W.D. Mo. Nov. 27, 2019).

[8]Even in the cases cited by the government where courts expressed the view that § 1115 was a Commerce Clause statute, the conduct at issue occurred on navigable-in-fact waters within the general admiralty jurisdiction. See LaBrecque, 419 F. Supp. at 431 (Atlantic Ocean); Holtzhauer, 40 F. at 78 (Newark Bay) Beacham, 29 F. at 285 (Chesapeake Bay); Jackson, 26 F. Cas. at 559 (East River).

-11-

v. United States, 572 U.S. 844, 857 (2014) ("The problem with this interpretation is that it would dramatically intrude upon traditional state criminal jurisdiction, and we avoid reading statutes to have such reach in the absence of a clear indication that they do." (citation omitted)).

B.     46 U.S.C. § 2302(b)

The government also argues that 46 U.S.C. § 2302(b) is a Commerce Clause statute. Enacted as part of the Motorboat Act of 1940, § 2302(b) makes it a class A misdemeanor for a person to "operat[e] a vessel in a grossly negligent manner that endangers the life, limb, or property of a person." Unlike § 1115, this statute includes an express reference to its prescriptive reach, which is defined and limited by admiralty jurisdiction. See 46 U.S.C. § 2301 ("[T]his chapter applies to a vessel operated on *waters subject to the jurisdiction of the United States*." (emphasis added)). We also note that the title of the act under which this statute was originally enacted refers to "the navigable waters of the United States," further reinforcing the conclusion that it was passed pursuant to Congress's admiralty authority. See Act of April 25, 1940, Pub. L. No. 76-484, 54 Stat. 163 ("An Act – [t]o amend laws for preventing collisions of vessels, to regulate equipment of certain motorboats on the navigable waters of the United States, and for other purposes."). We therefore reject the government's argument that § 2302(b) is a Commerce Clause enactment whose reach is not limited by the scope of federal admiralty jurisdiction.

III.

Because the government has failed to demonstrate that Congress enacted 18 U.S.C. § 1115 and 46 U.S.C. § 2302(b) pursuant to its power to regulate interstate commerce, we next consider whether the district court properly dismissed the charges against Defendants as outside the limits of the general admiralty jurisdiction. The government argues that the court's admiralty jurisdiction extends to crimes occurring on Table Rock Lake because the lake is presently navigable under the navigability-in-fact test.

Article III, § 2 of the Constitution confers to the federal courts general subject matter jurisdiction over all admiralty and maritime cases involving waters that are navigable in fact. Kaiser Aetna v. United States, 444 U.S. 164, 171–72, 172 n.7 (1979). We have held that "the concept of 'navigability' in admiralty is properly limited to describing a present capability of waters to sustain commercial shipping." Livingston v. United States, 627 F.2d 165, 169–70 (8th Cir. 1980); see id. at 170 ("[A]bsent some present or potential commercial activity, there is no ascertainable federal interest that justifies frustrating the legitimate interests of the states in providing a forum and applying their law to regulate conduct within their borders." (citing Adams v. Mont. Power Co., 528 F.2d 437, 439 (9th Cir. 1975)).

In its order dismissing the indictment, the district court here found that Table Rock Lake is not navigable for purposes of admiralty jurisdiction as a matter of law under our decision in Edwards v. Hurtel, 717 F.2d 1204 (8th Cir. 1983) (per curiam), aff'd on reh'g, 724 F.2d 689 (8th Cir. 1984) (per curiam). In Edwards, an injured boater sued another boater after their vessels collided on Table Rock Lake. 717 F.2d at 1205. The plaintiff brought claims under 28 U.S.C. § 1333 and invoked the court's admiralty jurisdiction. Id. In assessing whether Table Rock Lake was navigable in fact and therefore subject to admiralty jurisdiction, the district court took judicial notice of the following facts:

> The recreational nature of Table Rock Lake is generally known within the territorial jurisdiction of this Court. The lake has not been susceptible of use for commercial shipping and in fact has been used exclusively for recreational activities. Furthermore, there is no reasonable likelihood that Table Rock Lake will become or be made navigable in the near future.

Id. (cleaned up). On review, this court applied the judicially noticed facts to the navigability-in-fact standard and affirmed the district court's determination that Table Rock Lake was not navigable in fact. Id.

-13-

Here, the government objects to the district court's reliance on Edwards as binding precedent regarding the status of Table Rock Lake and argues that the evidence of commercial activity on Table Rock Lake presented in this case establishes that the lake is navigable in fact. However, before deferring to Edwards, the district court reviewed all of the evidence submitted by the parties and found that the nature and frequency of commercial shipping on the lake had not substantially changed since the Edwards decision. Thus, the district court concluded that even if the Edwards precedent was not binding, it would still find that Table Rock Lake is not navigable in fact.

We detect no clear error in the district court's finding that the nature and frequency of commercial shipping on Table Rock Lake has not changed substantially since Edwards, and we agree with its conclusion that Table Rock Lake is not navigable in fact. The government points to mostly recreation-based commercial activity taking place on Table Rock Lake to argue that it functions as a highway of commerce and is thus navigable in fact. But under our precedent, "the concept of 'navigability' in admiralty is properly limited to describing a present capability of waters to sustain commercial shipping." Livingston, 627 F.2d at 169–70. Accordingly, evidence of recreational activity on the lake does not establish that it is navigable in fact. See Edwards, 717 F.2d at 1205 (finding Table Rock Lake non-navigable because it had "not been susceptible of use for commercial shipping and in fact ha[d] been used exclusively for recreational activities").

IV.

For the foregoing reasons, we affirm the district court's dismissal of the indictment. See United States v. Love, 20 F.4th 407, 411–12 (8th Cir. 2021) (explaining that because "federal jurisdiction over a particular place is a question of law," a district court "may take judicial notice that a place is within the special maritime and territorial jurisdiction of the United States and not submit that issue to the jury").

GRASZ, Circuit Judge, concurring.

The tragedy on Missouri's Table Rock Lake in July of 2018 is one of historic proportions and horrendous personal loss to the families involved. The issue before us, though, is whether it also gives rise to valid federal criminal charges. I agree that it does not. I write separately to emphasize the unique circumstances leading to my conclusion that the prescriptive reach of 18 U.S.C. § 1115—the so-called Seaman's Manslaughter Statute—is limited to the admiralty jurisdiction of the United States.

At its core, this case implicates principles of federalism. "Under our federal system, the 'States possess primary authority for defining and enforcing the criminal law.'" United States v. Lopez, 514 U.S. 549, 561 n.3 (1995) (quoting Brecht v. Abrahamson, 507 U.S. 619, 635 (1993)). And so we have "good reason to rely on a clear statement principle of statutory construction." Raygor v. Regents of Univ. of Minn., 534 U.S. 533, 534 (2002). "When 'Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.'" Id. (quoting Will v. Michigan Dep't of State Police, 491 U.S. 58, 65 (1989)). This is particularly true when it is done within the context of a criminal statute, where we apply the rule of lenity. See Jones v. United States, 529 U.S. 848, 858 (2000) (explaining "when [a] choice has to be made between two readings of what conduct Congress has made a crime, it is appropriate, before we choose the harsher alternative, to require that Congress should have spoken in language that is clear and definite" (quoting United States v. Universal C.I.T. Credit Corp., 344 U.S. 218, 221–22 (1952))). So, the dispositive question here becomes whether Congress was sufficiently clear that it meant to extend criminal liability to non-navigable waters, something that historically was—with some delineated exceptions—within the States' jurisdictions.

Admittedly, the text of the statute could be read as suggesting Congress did intend to so expand criminal liability. After all, the statute is silent about jurisdictional limits. But under these unique circumstances, it is the very absence of *any* jurisdictional limit that creates ambiguity as to whether Congress intended such

-15-

a result.  See generally West v. Kerr-McGee Corp., 765 F.2d 526, 529 (5th Cir. 1985) ("When . . . a statute contains 'latent ambiguities' despite its superficial clarity, we turn to the statute's legislative history for guidance."); 2A Sutherland Statutory Constr. § 46:4 (7th ed.) (collecting cases discussing latent ambiguities).  Indeed, Congress cannot enact criminal penalties unless the Constitution grants it such power.  See Torres v. Lynch, 578 U.S. 452, 457 (2016).  And, as the lead opinion explains, if Congress was acting pursuant to its power to regulate interstate commerce as the government suggests, one would expect to see either a jurisdictional element or congressional findings that the regulated conduct substantially affects interstate commerce.[9]  See also id. (explaining "most federal offenses include, in addition to substantive elements, a jurisdictional one").  Neither is present here.

To the contrary, unless a jurisdictional limit is read into the text, 18 U.S.C. § 1115 would apply to the negligent operation of "vessels"[10] everywhere in the United States.  An owner of a canoe or small fishing boat whose ordinary negligence results in a death on a farm pond in Nebraska could be charged with Seaman's Manslaughter under federal law.  There is no basis to conclude that is what Congress intended when it enacted the statute.

---

[9]And if we ignored this clue and assume Congress enacted the Seaman's Manslaughter Statute pursuant to its power to regulate interstate commerce, the absence of a jurisdictional element would seemingly mean there is no limit on the law's reach.  Lopez, 514 U.S. at 562.  This would compound the "legal uncertainty" inherent when Congress enacts legislation under the Commerce Clause because it would suggest there is no "judicially enforceable outer limits" to Congress' power to criminalize behavior.  Id. at 566.

[10]See United States v. Holmes, 104 F. 884, 886 (N.D. Ohio 1900) (concluding the term "vessel" in what is now 18 U.S.C. § 1115 "includes every description of water craft . . . used, or capable of being used, as a means of transportation on water").

The government attempts to avoid this absurdity by supplying and injecting additional verbiage into the statute—namely by adding "commercial" before "vessel." But this proposed solution suffers from a defect similar to that for which the government faults the district court's interpretation—adding to the plain text of the statute. Since either interpretation ultimately requires the court to add some sort of limiting language, it makes sense to interpret the statute with the assumption that Congress did not intend to disrupt the Constitution's federal-state balance. See United States v. Bass, 404 U.S. 336, 349–50 (1971). All this leads me to conclude § 1115's prescriptive reach is limited to the admiralty jurisdiction of the United States. Because admiralty jurisdiction is lacking here, dismissal of the indictments was appropriate.

ERICKSON, Circuit Judge, concurring in part and dissenting in part.

On the issue of the navigable nature of Table Rock Lake, I note that while I may have reached different factual findings as to the underlying question of whether Table Rock Lake is presently capable of "sustaining commercial shipping," I agree that the district court committed no clear error in its findings and that those findings support the conclusion that Table Rock Lake is not navigable in fact.

The analysis on the defendants' motion to dismiss the indictment should have ended with the conclusion that jurisdiction exists under 18 U.S.C. § 3231. Even if subject matter jurisdiction hinges on which power Congress exercised when it enacted § 1115, I am convinced that the Congress enacted § 1115 under its Commerce Clause power and I respectfully dissent as to the charged offenses under § 1115.

Section 3231 grants federal district courts jurisdiction over "all offenses against the laws of the United States." 18 U.S.C. § 3231. When a court has jurisdiction over a federal criminal case pursuant to § 3231, that is the "beginning and the end of the 'jurisdictional' inquiry." United States v. White Horse, 316 F.3d 769, 772 (8th Cir. 2003) (quoting Hugi v. United States, 164 F.3d 378, 380 (7th Cir.

1999)) (dismissing the defendant's assertion that indictment was fatally flawed when it lacked a supposedly jurisdictional element because that element was only "relevant to the matter of proof but irrelevant on the matter of jurisdiction"). The district court's determination that it had subject matter jurisdiction over this case under § 3231 ended the jurisdictional question.

This is not an international waters case where Congress's authority to regulate may be questionable. See United States v. Prado, 933 F.3d 121, 136–38 (2d Cir. 2019) (discussing the reach of the Maritime Drug Law Enforcement Act in extraterritorial waters). By considering the statute's prescriptive reach, and whether the indictment met the requisite elements of § 1115, the district court and majority conflated merits questions with the jurisdictional question. See United States v. Cotton, 535 U.S. 625, 631 (2002) (explaining courts have "jurisdiction of all crimes cognizable under the authority of the United States" and objections to an indictment "go[] only to the merits of the case" (citation omitted)). If the analysis is properly limited to jurisdiction, the § 1115 charges should not have been dismissed on jurisdiction grounds.

Even if we were required to look beyond § 3231, a district court does not need to have admiralty jurisdiction to hear a criminal case under 18 U.S.C. § 1115 because the text of the statute demonstrates that § 1115 was enacted under Congress's Commerce Clause power. Equally telling, nothing in the text of the statute indicates it was enacted pursuant to Congress's admiralty powers.

Cases decided contemporaneously with § 1115's statutory precursor from 1838 recognized the statute "was enacted by [C]ongress in the proper exercise of its constitutional power 'to regulate commerce.'" United States v. Holtzhauer, 40 F. 76, 78 (C.C.D.N.J. 1889) (discussing Act of July 7, 1838, ch. 191, § 12, 5 Stat. 304, 306). See also United States v. Beacham, 29 F. 284, 284 (C.C.D. Md. 1886) (same); United States v. Jackson, 26 F. Cas. 559, 561 (S.D.N.Y. 1841) (same).

The history of the alterations of § 1115 and its statutory predecessors does not appear to me to be helpful to establish which power Congress used to enact the original 1838 law.  And the other laws enacted alongside what would later become § 1115 do not undermine the statute's commercial language and the contemporaneous understanding that the statute was an exercise of Congress's commerce power.  See, e.g., United States v. Jackson, 26 F. Cas. 559, 561 (S.D.N.Y. 1841).

For these reasons, I would reverse the district court's dismissal of the indictment.

_____